Jarrett Unemployment Compensation Case.
Westinghouse Electric Corporation, Appellant, *v.*
Unemployment Compensation Board of Review.

Argued November 15, 1956.  Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ.

*John C. Wayman*, with him *Leonard L. Scheinholts, John W. Wishart,* and *Reed, Smith, Shaw & McClay,* for appellant.

*Sydney Reuben,* Special Deputy Attorney General, for appellee.

*Albert C. Shapira,* for intervenor.

OPINION BY WOODSIDE, J., December 28, 1956:

This is an appeal from the decision of the Unemployment Compensation Board of Review reversing the

referee's order and allowing benefits to the claimant on the ground that the claimant's unemployment was not "due to voluntarily leaving work without cause of a necessitous and compelling nature" within the meaning of section 402(b) of the Unemployment Compensation Law, as amended by the Act of August 24, 1953, P.L. 1397, section 4, 43 PS §802. From the allowance of benefits, the employer has appealed to this Court.

The claimant, Ruth H. Jarrett, had been employed by the Westinghouse Electric Corporation for a period of three years and three months, commencing in January, 1952. Claimant, while in the employ of the company, was married on July 11, 1953. She was a member of the Association of Westinghouse Salaried Employes, which was the bargaining representative for the employes of the company in her category. In accordance with a local supplement to the agreement entered into between the union, as the bargaining representative of the employes, and the company on June 18, 1952, the claimant lost her seniority rights as a result of her marriage. The supplemental agreement provides as follows: "When a woman becomes married she will have no seniority rights with regard to reduction in force or upgrading but she may continue employment."

The claimant was continued in her employment for a period of approximately twenty-one months subsequent to her marriage until, on March 31, 1955, the company directed a reduction in force at the establishment. Since in such a situation the Westinghouse workers are retained in their employment on the basis of seniority, this claimant, who had lost her seniority as a result of her marriage, was laid off by the company.

It is the contention of the employer that the claimant is disqualified under §402(b), supra, because she

was a party to an agreement which provided for loss of seniority in the event of marriage, and since she married, and as a consequence lost her seniority, her subsequent unemployment arising at the time of the employer's reduction in the number of employes was caused by her own voluntary acts. The employer further contends that this case falls within the doctrine of the *Means Unemployment Compensation Case*, 177 Pa. Superior Ct. 410, 110 A. 2d 886 (1955) and the *Elliott Company Unemployment Compensation Case*, 180 Pa. Superior Ct. 542, 119 A. 2d 650 (1956), wherein the claimants were denied benefits by this Court. With this contention we do not agree.

In the *Means* case the company-union agreement provided, inter alia: "Any woman presently employed will be required to resign if she marries . . .". As a result of this agreement, the claimant was immediately severed from her employment upon her marriage. We there held that the claimant was voluntarily unemployed as the result of the action of her own delegated bargaining agent in entering into the agreement and her subsequent act of marrying which directly resulted in her separation from employment.

The doctrine of the *Means* case was followed in the *Elliott* case, wherein the same clause of the contract resulted in the disqualification of a non-union employe, who had accepted the contract as one of the terms and conditions of employment, and had subsequently married.

In the *Means* and *Elliott* cases, no discretion was left to the employer to maintain the employe on the rolls of the company. Marriage automatically resulted in termination.

In the instant case the company-union contract does not provide for immediate severance of the employ-

ment relationship upon marriage, but only for a loss in seniority. The employe is permitted to continue in employment until some other condition arises which puts to the test the claimant's seniority, as in the instant case, a reduction in the number of employes at the establishment.

While, as we have said, the phrase "due to" imports a causal relationship and brings into the Unemployment Compensation Law the principles and theory of legal causation (See *Campbell Unemployment Compensation Case,* 175 Pa. Superior Ct. 592, 106 A. 2d 687 (1954)), nevertheless, "cause of a necessitous and compelling nature" must reflect the underlying purpose of the Act to relieve against the difficulties of involuntary unemployment.

While the act of the bargaining agent in negotiating an agreement can serve to bind the employe by its terms, it nevertheless, in the instant case, only bound her to accept a loss of seniority in the event of her marriage. While this loss in seniority served to make her job security more tenuous in the event that economic conditions required a reduction in force at the establishment, it was nevertheless only to a loss in seniority that she was bound.

When, after an additional twenty-one months of employment, the employer reduced its labor force, thereby causing a termination of the claimant's status as an employe, the onus for this separation was upon its shoulders and not upon the claimants. A reduction in the number of employes by an employer is one of the exigencies against which the Unemployment Compensation Law was clearly designed to protect. See Article I, Section 3, of the Act of December 5, 1936, P. L. 2897, 43 PS §752.

In the instant case, the claimant's marriage did not have as its direct and immediate consequence her un-

employment. It required a further event to cause a severance in the employment relationship, and that event—a reduction in the number of employes—was one which the employer admits was not within the control of the claimant. If the employer had not reduced the number of his employes, the claimant, even with her diminished seniority, could have continued working indefinitely for this employer. Thus, an act clearly outside the claimant's control resulted in her unemployment. As a matter of fact, there is no way of determining from the record whether the seniority which the claimant would have had had she not married would have been sufficient to retain her employment for her at the time the reduction in force was instituted.

Although the decision of this case must, of course, depend upon the rights which the individual claimant has under the Act, it nevertheless is interesting to examine how the rule we adopt in this case and the rule of the *Means* and *Elliott* cases are in harmony, and operate equitably when applied to the unemployment problem as a whole. This can best be done by applying the rules to two hypothetical cases. It must be remembered in considering them that an employer ordinarily carries a substantial part of the expense of paying unemployment compensation to his former employes through his increased rate of contribution which is based in part on the number of his former employes who are receiving compensation as a result of their separation from his employment.[1] Let us assume that there are two employers each with 100 female employes, "A" with an employment contract like that in the *Means* and *Elliott* cases, and "B" with a contract

---

[1] See the Act of May 26, 1943, P.L. 639, as amended, 43 PS §781, which provided for the merit rating system.

like the one in this case. Over a period of time, five of "A's" employes get married and thus are severed from their employment. As there would be no correlation between the number of his employes who get married and "A's" need for employes at that time to carry on his business, each of the five presumably would be replaced by another worker when she quit. Applying the rule of the *Means* and *Elliott* cases "A" will not be charged with the payment of compensation to the five who quit. In other words, he will not be required to pay salaries to 100 employes and at the same time contribute to five additional persons through increased unemployment compensation contributions, and thus contribute toward a total of 105. The total number of employes in the Commonwealth is not reduced, as he is still employing 100 women. On the other hand, let us assume that "B" has a contract like the appellant in this case, and after five of his employes marry, at a later time convenient to him, he reduces the number of his employes to 95. If we were to adopt the theory of the appellant, the total number of unemployed in the Commonwealth would be increased by five without those five receiving any unemployment compensation and "B" would accordingly not be charged with the unemployment compensation of the five whom he has discharged. He would be paying wages to only 95 people. He would be creating the very situation the Unemployment Compensation Law was passed to alleviate. Under the rule we have here adopted, "B" would be paying toward 100 employables, 95 through salaries and five through unemployment compensation. Under the rule of this case, and the rule of the *Means* and *Elliott* cases the employers in our hypothetical cases, will both be assisting in the support of the same number of employable persons,—the number with which they started.

In the *Means* and *Elliott* cases the employes lost their jobs when they married because they voluntarily agreed they should. In this case the employe lost her job because the employer reduced the number of his employes. It was the employer, and not the claimant, who decided *whether and when* her employment should cease.

. Order affirmed.