**MISSOURI DIVISION OF EMPLOY-
MENT SECURITY, Appellant,**

v.

**LABOR & INDUSTRIAL RELATIONS
COMMISSION OF MISSOURI, William
F. Rothman, et al., Respondents.**

**No. 64472.**

Supreme Court of Missouri,
En Banc.

May 31, 1983.

Larry R. Ruhmann, Rick V. Morris, Jefferson City, for appellant.

Timothy P. Duggan, Counsel, Labor & Industrial Relations Com'n, Jefferson City, for respondents.

DONNELLY, Judge.

This case concerns qualification and eligibility for unemployment compensation and is governed by Chapter 288, RSMo 1978. Twelve workers, formerly employed by Uniroyal, Inc., at its Maryville, Missouri, plant, filed claims for unemployment compensation. All claims were denied by deputies of the Division of Employment Security (Division), which denials were affirmed by the Appeals Tribunal. On review by the Labor and Industrial Relations Commission, such determinations were reversed. The circuit court then affirmed the Commission on application for judicial review. The Court of Appeals affirmed the circuit court's judgment affirming the Commission. The cause was then transferred to this Court on certification by a dissenting judge. Mo. Const. art. V, § 10.

The facts are undisputed. Claimants are production employees of Uniroyal, Inc. at its plant in Maryville, Missouri. The plant usually operates with a workforce of approximately 160 employees. In October 1979, Uniroyal determined that for economic reasons it was necessary to eliminate twenty-one positions. Following its usual procedure, it called an employee meeting of all the people in the plant. At that meeting it announced that twenty-one jobs were to be eliminated on a certain date. Company policies regarding layoffs were explained. Uniroyal utilized two policies: the seniority method, by which senior employees whose jobs were to be eliminated were retained by "bumping" those with less seniority; and the volunteer method, by which employees who would not otherwise be laid off were given the opportunity to be considered for the layoff by waiving their seniority rights. The final decision as to who was to be laid off was made by the company, based on its determination of practicality and the effective operation of the plant. The volunteer policy was part of an overall employee relations system, and was considered to allow Uniroyal to make the best of a bad situation. Lists were also presented at the meeting of which jobs were to be eliminated and of those who would be affected if the seniority system were carried out.

A number of the more senior employees did volunteer to be considered for layoff. This appeal involves twelve volunteers chosen by the company, eleven of whom had sufficient seniority to continue working and one of whom was on the original list of 21 to be laid off by the seniority system. All filed an initial claim under Chapter 288, and each expected to collect an amount consisting of state unemployment compensation supplemented by unemployment benefits provided by Uniroyal equalling 75% of their base salary. Their claims were denied by deputies of the Division on one or both of the following grounds: (1) that the claimant had left work voluntarily without good cause attributable to his work or to his employer, or (2) that the claimant was not available for work.

On appeal, the Appeals Tribunal consolidated all twelve claims and held a single hearing on December 17, 1979. Among those testifying were the plant manager and industrial relations manager, both of whom testified on behalf of the claimants regarding, among other things, the purpose of the volunteer policy and the manner in which it was carried out. On January 15, 1980, the Appeals Tribunal issued its decision affirming the determination of the deputies of the Division.

All of the claimants filed timely applications for review with the Commission. The Commission issued its decision on July 23, 1980, reversing the decision of the Appeals Tribunal and finding that each of the claimants was discharged on November 1 or 2, 1979, but not for misconduct connected with his work. The Commission further found that each claimant was available for work. Pertinent portions of the Commission's decision are as follows:

The Commission finds that the employees had no voice as to whether the jobs would be eliminated in the first instance. It is clear the employees had no choice as to which jobs should be eliminated. The fact that some persons would be laid off because these jobs were not available is in no way the fault of any employee. All employees merely had the opportunity, subject to the employer's ultimate decision, to say "choose me, rather than another." Each claimant here volunteered for the layoff and was selected.

One issue to be decided is whether the fact that any one employee agreed to be among those considered for the layoff supports a finding that that person voluntarily quit his job when his employer then chose to lay him off. The other issue is whether such employee is unavailable for work when a job is eliminated by his employer and the claimant volunteers to suffer the consequences of the lack of work. It is clear in this case that the employer decided whether to eliminate a job and whether to lay off a given individual, according to the employer's needs.

The decision of the Appeals Tribunal on both issues is based on the fact that

any claimant here could have prevented the employer from choosing him for the layoff by not volunteering to be considered for a layoff. The Appeals Tribunal found that each claimant chose to withdraw from the labor market because each waived his seniority right to stay with this employer and force someone else into a state of unemployment clearly attributable to a decrease in available jobs.

The Commission does not agree, however, that a waiver of one's seniority rights is tantamount to completely withdrawing from the labor market. It is clear no claimant desired to quit his job, apart from the circumstances that twenty-one (21) positions were to be eliminated by the choice of the employer. In light of the employer's supplemental unemployment benefits, it is clear that each claimant here effectively volunteered to sustain a twenty-five percent (25%) reduction in his base pay, as well as a loss of any overtime he may have earned, in order to benefit his employer, and a fellow worker. The Commission draws a compelling inference that each person volunteered to make a sacrifice because he could afford to do so.

These claimants were discharged for a lack of available work with this employer. The Commission entertains no doubt that if the employer had chosen certain employees for layoff without giving those persons any choice in the matter, such individuals would be entitled to unemployment insurance benefits as a result of the discharge by the employer. The fact that each of these claimants is unemployed is no less attributable to the employer's decisions.

Through the Employment Security Law employers share the cost of benefits paid to those who are unemployed "through no fault of their own." The term "unemployment" means lack of employment, a condition which results from the failure of industry to provide employment. *Brown v. Labor & Industrial Relations Comm'n.*, 577 S.W.2d 90, 93 (Mo. App.1978). This employer reduced employment by twenty-one (21) jobs and the benefits should be paid to those consequently laid off. It should not matter which of several employees are sacrificed, nor does it matter that a claimant participated in the decision. The ultimate choice belonged to the employer, and the ultimate responsibility for the unemployment of each of these claimants lies only with the employer's decision to reduce available jobs.

Furthermore, the Commission finds that these claimants are no less available and are no less a part of the State's work force than an employee who had no choice as to whether he would be laid off when a given number of jobs were eliminated, and work was no longer available through this employer. These claimants made an active and earnest search for work and were available for work for this employer or any other if work was available. Availability is a question of fact. It is nowhere defined in the Employment Security Law because of the great number of subtle factors involved. The Commission is the final arbiter on this issue; in its considered judgment of all the factors involved in this case, the Commission can only infer that these persons were available for work.

\* \* \* \* \* \*

Another public policy is involved here. Although the Appeals Tribunal had no intention of substituting its judgment for that of the employer as to which employees shall be laid off, the effect of the decision of the Appeals Tribunal is nothing less than that. Also, it is clear that the Appeals Tribunal has effectively interfered with this employer's policies which are designed to promote harmonious employer-employee relations. This should be avoided. \* \* \*.

The circuit court affirmed the findings and rulings of the Commission, and the Western District affirmed the circuit court's judgment. We review as if on original appeal. Mo. Const. art. V, § 10.

The Division contends, first, that the Commission's determination that each claimant was not discharged for misconduct connected with his work is not supported by competent and substantial evidence on the record as a whole and is based upon an erroneous interpretation of § 288.050, RSMo 1978. The Division's second point is that the Commission's determination that each claimant was available for work is not supported by the evidence and misinterprets § 288.040.1(2).

The pertinent portion of § 288.050 reads as follows:

Notwithstanding the other provisions of this law a claimant shall be disqualified for waiting week credit or benefits until after he has earned wages equal to ten times his weekly benefit amount if the deputy finds

(1) That he has left his work voluntarily without good cause attributable to his work or to his employer. * * *

The guide to judicial interpretation of Chapter 288 is the legislature's expression of policy in § 288.020, RSMo 1978:

1. As a guide to the interpretation and application of this law, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to health, morals, and welfare of the people of this state resulting in a public calamity. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

2. This law shall be liberally construed to accomplish its purpose to promote employment security both by increasing opportunities for jobs through the maintenance of a system of public employment offices and by providing for the payment of compensation to individuals in respect to their unemployment.

Accordingly, it has been held that provisions for benefits for persons unemployed through no fault of their own require liberal construction, *Swafford v. Industrial Commission,* 462 S.W.2d 147 (Mo.App.1970); *Citizens Bank of Shelbyville v. Industrial Commission,* 428 S.W.2d 895 (Mo.App.1968); and that disqualifying provisions of the law are to be strictly construed against the disallowance of benefits to unemployed but available workers. *Brown v. Labor & Industrial Relations Commission,* 577 S.W.2d 90 (Mo.App.1978); *Bussmann Mfg. Co. v. Industrial Comm'n,* 327 S.W.2d 487, 491 (Mo.App.1959); *Kroger Co. v. Industrial Comm'n,* 314 S.W.2d 250, 254 (Mo.App. 1958). The statutory language denying an employee benefits if "he has left his work voluntarily without good cause attributable to his work or to his employer" must be construed in the light of the policy expressed by the legislature in § 288.020, RSMo 1978.

The courts have understood the purpose of the unemployment compensation laws to be "to provide for the compulsory setting aside of an unemployment reserve to be used for the benefit of persons unemployed through no volition of their own." *Bussmann Mfg. Co. v. Industrial Commission,* 335 S.W.2d 456, 461 (Mo.App.1960). "Good cause" has been defined by courts in Missouri in the following way:

Obviously, "good cause," as used in the Law should and does contemplate and require a cause reasonably sufficient to justify an employee in voluntarily leaving the ranks of the employed and joining the ranks of the unemployed, or, otherwise stated, a cause which reasonably would motivate the average able-bodied and qualified worker in a similar situation to terminate his or her employment with its certain wage rewards in order to enter the ranks of the compensated unemployed. And "good cause" has been appropriately characterized as requiring not only the merely negative virtue of freedom from fraud but also positive conduct which is consistent with a genuine desire to work and be self-supporting.

*Belle State Bank v. Industrial Commission,* 547 S.W.2d 841, 846 (Mo.App.1977). Fault, the absence of which is required to satisfy the policy demands of § 288.020, RSMo 1978, has been defined broadly: "[W]e do not interpret the word 'fault' as meaning something blameworthy, culpable, or wrongful, but find that word to mean 'failure' or 'volition' * * *." *Bussmann,* 335 S.W.2d at 461. "Volition," in turn, has been understood to mean the act of "willing or choosing; [an] act of deciding, as on a course of action or an end to be striven for." *Ballew v. Aiello,* 422 S.W.2d 396, 399n. (Mo.App.1967). The term "attributable" in § 288.050 has been understood to require a causal relationship between the disability and the work of the claimant. *Bussmann,* 327 S.W.2d at 491. In short, judicial interpretations of the unemployment statutes have required that an employee not have *caused* his dismissal by his wrongful action or inaction or his choosing not to be employed.

The Missouri view is generally in accord with that espoused in Pennsylvania. *Herbster v. Unemployment Compensation Board of Review,* 186 Pa.Super. 172, 142 A.2d 747 (1958) (employee who elected to relinquish seniority rights and rights to recall in exchange for payment of displacement wages under terms of collective bargaining agreement held not entitled to benefits because had voluntarily left his employment without cause); *Amado v. Unemployment Compensation Board of Review,* 177 Pa.Super. 506, 110 A.2d 807 (1955) (employee held to have voluntarily left his employment for cause and to be ineligible for benefits from March 6, 1954, after he announced his intent to resign effective March 31, 1954, employer hired a replacement on March 1, 1954, and employer advanced former employee's termination to March 6, 1954); *Comstock v. Commonwealth Unemployment Compensation Board of Review,* 63 Pa. Commw. 380, 437 A.2d 1318 (1981) (laid-off employee who failed to utilize his right to "bump" less senior employees under collective bargaining agreement held voluntarily unemployed and hence not entitled unemployment compensation benefits); *Fisher v.*

*Commonwealth, Unemployment Compensation Board of Review,* 38 Pa.Commw. 518, 393 A.2d 1304 (1978) (employee's termination held voluntary and unemployment benefits denied when employee signed off a specific job, returned to plant labor pool and was subsequently laid off).

However, in bringing into unemployment compensation law the principles and theory of legal causation, *Campbell v. Unemployment Compensation Board of Review,* 175 Pa.Super. 592, 106 A.2d 687, 689 (1954), Pennsylvania courts have restricted such causation to that having as its *direct* and *immediate* consequence the claimant's unemployment. *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review,* 182 Pa.Super. 491, 495, 128 A.2d 184, 186 (1956). Thus in the *Westinghouse* case, where an agreement between a union and an employer provided that when a woman marries she loses seniority, a claimant who married and was later laid off was allowed to collect benefits because her marriage did not have her unemployment as its direct and immediate consequence:

> [T]he claimant's marriage did not have as its direct and immediate consequence her unemployment. It required a further event to cause a severance in the employment relationship, and that event—a reduction in the number of employes—was one which the employer admits was not within the control of the claimant. If the employer had not reduced the number of his employes, the claimant, even with her diminished seniority, could have continued working indefinitely for this employer. Thus, an act clearly outside the claimant's control resulted in her unemployment.

*Westinghouse,* 182 Pa.Super. at 495–96, 128 A.2d at 186.

The *Herbster* case distinguished *Westinghouse* on the matter of direct and immediate causation. While in *Westinghouse* the employee's voluntary action required a later event controlled by the employer before unemployment resulted, in *Herbster* the employer was apparently bound by the col-

lective bargaining agreement with the employee's union to lay off volunteers. *See also Warner Co. v. Unemployment Compensation Bd. of Review,* 396 Pa. 545, 551, 153 A.2d 906, 909 (1959). Thus, in Pennsylvania, the direct and immediate cause of unemployment controls eligibility for benefits.

The approach taken in New Jersey and Arkansas may be broader. In a leading New Jersey case, for example, Judge (now Justice) William J. Brennan, Jr., wrote, "The Legislature plainly intended that the reach of the subsection was to be limited to separations where the decision whether to go or to stay lay at the time with the worker alone * * * " *Campbell Soup Co. v. Board of Review,* 13 N.J. 431, 435, 100 A.2d 287, 289 (1953), cited with approval in *Warner,* 396 Pa.Super. at 551, 153 A.2d at 909–10. Arkansas holds to a similar view. The Court of Appeals of Arkansas has stated:

> In the instant case, the employee should not be penalized for taking the burden of being laid-off upon himself. The fact that the claimant preferred to be one of the employees subject to the lay-off does not alter the fact that his employment ended by reason of a work reduction instituted by the employer and not, as the Board of Review stated, for personal reasons. We find no substantial evidence to support the Board of Review's decision, and this case is reversed and remanded.

*Terry v. Director of Labor,* 3 Ark.App. 197, 199, 623 S.W.2d 857, 858 (1981) (claimant held entitled benefits after employer initiated a reduction in work force and claimant chose to take the layoff rather than a transfer since the transfer would have required "bumping" another employee). *See also Jackson v. Daniels,* 267 Ark. 685, 590 S.W.2d 63 (App.1979) (claimant manager of restaurant held entitled unemployment compensation benefits after being laid off subsequent to expressing preference that if anyone was laid off, she hoped it would be her).

■ We find the Pennsylvania reasoning persuasive, and adopt the Pennsylvania view that the causation envisioned in the unemployment compensation statutes is that having as its direct and immediate consequence the claimant's unemployment.

■ The undisputed facts in this case fully support the Commission's holding that the claimants had not left work voluntarily without good cause attributable to their work or to their employer. All claimants did volunteer for layoff. But, as the employer's plant manager testified, final determination as to the person to be laid off rested with the employer alone, according to *its* perceived needs. The employer's industrial relations manager testified it was the *employer's* unilateral policy to seek volunteers to promote *its* overall employee relations system, and make the best of a bad situation. This policy was to be carried out *by the employer* only if the volunteers were not seen to be required for the effective operation of the plant. The claimants' volunteering for layoff did not have their unemployment as its *direct* and *immediate* result. A further event—the *employer's* choosing them for layoff—was required. As the employer's action was the direct and immediate cause of their unemployment, they are not barred from receiving unemployment compensation under § 288.050.

The second statutory provision on which the Division relies is § 288.040.1, RSMo 1978. Pertinent portions of this section provide as follows:

> A claimant who is unemployed and has been determined to be an insured worker shall be eligible for benefits for any week only if the deputy finds that
>
> \* \* \* \* \* \*
>
> (2) He is able to work and is available for work; provided, however, that no person shall be deemed available for work unless he has been and is actively and earnestly seeking work; * * *.

The Division contends that the Commission's findings and rulings that these claimants were available for work is not supported by competent and substantial evidence upon the whole record and is based upon an erroneous interpretation of § 288.040.1(2). The Division's position is essentially that expressed by the Appeals Tribunal:

The evidence shows the claimants recognize that employment in some suitable capacity was available for them with their former employer had they wished to continue working. Since suitable work was readily available to each of the claimants had they chosen to continue working, it is found, by the very fact that they chose to stop working, they had in effect withdrawn from the labor market and therefore cannot be deemed available for work.

■ The expression "available for work" under § 288.040.1(2) has not been defined by our courts. Instead, Missouri courts have chosen to determine availability on a case-by-case basis. *Golden v. Industrial Commission,* 524 S.W.2d 34, 36 (Mo.App. 1975). However, "a claimant must clearly possess a genuine attachment to the labor market and be able, willing, and ready to accept suitable work." *Producers Produce Co. v. Industrial Commission,* 365 Mo. 996, 291 S.W.2d 166, 177 (Mo. banc 1956).

■ The record is replete with testimony that these claimants sought employment with other employers and held themselves out for employment with others and with Uniroyal itself. Consequently, whether claimants satisfied the requirements of § 288.040.1 depends upon whether volunteering for layoff rendered them unwilling or unable to accept suitable work with Uniroyal. We do not believe that claimants' volunteering to be considered by their employer for lay-off affects their ability or willingness to accept suitable work after lay-off. The Commission's finding that claimants were no less available and no less a part of the State's work force than an employee who had no choice as to whether he would be laid off when a given number of jobs were eliminated and work was no longer available through this employer is amply supported by competent and substantial evidence.

The judgment of the trial court affirming the Commission is affirmed.

All concur.