Quinzell WOODEN, Appellant,

v.

DIVISION OF EMPLOYMENT
SECURITY, Respondent.

No. WD 72856.

Missouri Court of Appeals,
Western District.

May 24, 2011.

Melissa M. Lawyer, St. Joseph, for Appellant.

Ninion S. Riley, Jefferson City, for Respondent.

Before GARY D. WITT, P.J., JAMES EDWARD WELSH, and ALOK AHUJA, JJ.

JAMES EDWARD WELSH, Judge.

Quinzell Wooden appeals the Labor and Industrial Relations Commission's decision that he is not eligible for unemployment benefits because his employer, The Summit, Inc., discharged him for misconduct connected with work. He claims that the Commission failed to make adequate factual findings as to whether his failure to pick up trash, which resulted in his termination, constituted misconduct connected with work. He also contends that, even if the Commission's findings were adequate, the evidence was insufficient to support the Commission's decision. Because the Commission's factual findings are insufficient to permit meaningful appellate review as to whether Wooden's failure to pick up trash constituted misconduct, we reverse and remand the case to the Commission to make adequate findings.

Wooden was employed by The Summit, Inc., a nursing home, in the position of floor technician[1] for approximately two years before he was terminated on January 25, 2010. Wooden subsequently filed a claim for unemployment benefits with the Division of Employment Security. The Summit objected to Wooden's claim on the basis that he was discharged because he failed to complete his assigned duties, specifically, picking up trash on the grounds first thing when he arrived at work on the morning of January 25, 2010. A Division deputy found that Wooden was not disqualified from unemployment benefits because his discharge was not for misconduct connected with work. The Summit appealed to the Division's Appeals Tribunal.

The Appeals Tribunal held a telephone hearing. During the hearing, Kathy Bass, an administrator for The Summit, testified that she fired Wooden on January 25, 2010, for not picking up the trash on the facility's grounds. She said that he had been given specific instructions "numerous times" to pick up the trash when he first arrived at work at 7:00 a.m. each morning. In fact, Bass said that she and Wooden's supervisor had a meeting four to five weeks before January 25, 2010, during which they reiterated these instructions. Bass said that the only exception to Wooden's being required to pick up the trash first thing in the morning was if there had been "a spill or something he had to clean up first."

Bass testified that, when she arrived at work at 7:40 a.m. on January 25, 2010, she saw several pizza boxes and pop cans on one side of the building. She said that when she asked Wooden about the trash, he said that it was dark. Bass testified that she was not aware of whether Wooden had to clean up a spill that morning, but even if he had been cleaning up a spill, "it wouldn't take an hour." Bass said that Wooden told her that a nurse had asked him to take keys to a CMT before he was able to pick up the trash, but she said that task would also not have taken an hour to complete. Bass further testified that Wooden had told her that he had picked up the trash but that it was windy and the trash must have blown onto the property after he did his initial trash pick-up. To refute Wooden's claim that it was windy, Bass brought in a printout from a local television station's website that showed the wind speeds and direction on January 25, 2010. She testified that the printout showed that the maximum wind speed was

1. Wooden's job duties as a floor technician were custodial in nature and included such tasks as sweeping, mopping, waxing, and buffing floors, cleaning up spills, and picking up trash on the facility's grounds.

only twelve to thirteen miles per hour between 7:00 and 8:00 a.m. Although the printout also showed that there were stronger wind gusts during that time, Bass said that there were buildings and a wall that would have blocked most of the wind on the side where the pizza boxes and pop cans were found.

Wooden also testified during the hearing. In his testimony, he acknowledged that he did not pick up the trash when he first arrived at work on the morning of January 25, 2010. According to Wooden, he had been specifically instructed that every Monday (which January 25, 2010, was), he was to clean the dining room and take out the trash on the first and second floors *before* he was to pick up the trash on the facility's grounds. Wooden said that, on the day that he was terminated, he spent about ten to fifteen minutes cleaning the dining room and about five minutes taking out the trash on the first and second floors before he went outside and picked up the trash that he saw. He testified that he did not remember what time he picked up the trash, but he knew that it was before 8:00 a.m. As for the meeting that occurred with Bass and his supervisor four to five weeks before his termination, Wooden testified that the reason that he was late picking up the trash on that earlier occasion was because there was a flood in several rooms, which he had to clean up first. Wooden testified that he was never instructed during that meeting, or at any other time, to pick up the trash first thing when he arrived at work each day.

After Wooden answered the Appeals Tribunal's questions, Bass asked Wooden about whether or not he knew that The Summit was expecting the State in for a survey on January 25, 2010. Wooden said that he was not aware that the State was going to be surveying the facility. Upon questioning from the Appeals Tribunal, Bass testified that the State had surveyed the facility four to five weeks earlier, which coincided with Wooden's earlier failure to pick up trash first thing in the morning. Bass testified that The Summit was expecting the State to return to the facility sometime around January 25, 2010, for the purpose of checking to see if The Summit had corrected any problems found during the first visit.

Following Wooden's testimony, The Summit offered the testimony of Wooden's supervisor, Willie Townsend. Townsend testified that he was in the meeting with Bass and Wooden four to five weeks before Wooden's termination and that he remembered telling Wooden to pick up the trash first thing in the morning. Townsend said that on the day of Wooden's termination, he also saw trash on the grounds that Wooden had not picked up. Townsend also testified that Wooden knew that the State was "due back for a revisit."

The Appeals Tribunal reversed the deputy's decision. The Appeals Tribunal concluded that Wooden's failure to pick up trash when he arrived at work on January 25, 2010, constituted misconduct connected with work and, therefore, Wooden was disqualified from receiving unemployment benefits. Wooden appealed to the Commission, who affirmed the Appeals Tribunal's decision and adopted the decision as its own.[2] Wooden appeals.

Appellate review of the Commission's decision in employment security matters is governed by section 288.210, RSMo 2000. We may modify, reverse, remand for rehearing, or set aside the Commission's decision on only these grounds: "(1) the Commission acted without or in excess of

---

**2.** One of the three Commissioners filed a dissenting opinion.

its power; (2) the award was procured by fraud; (3) the facts found by the Commission do not support the award; or (4) there was not sufficient, competent evidence in the record to warrant the making of the award." *Lewis v. Fort Zumwalt Sch. Dist.*, 260 S.W.3d 888, 889–90 (Mo.App. 2008) (citing § 288.210).

■ "The purpose of Missouri's unemployment compensation act is to provide benefits to persons who are unemployed through no fault of their own." *Guccione v. Ray's Tree Service*, 302 S.W.3d 252, 256 (Mo.App.2010). Because of this, we must strictly construe the act's disqualifying provisions " 'against the disallowance of benefits to unemployed but available workers.' " *Id.* (*quoting Mo. Div. of Emp't Sec. v. Labor & Indus. Rel. Comm'n of Mo.*, 651 S.W.2d 145, 148 (Mo. banc 1983)). One of these disqualifying provisions denies benefits to a claimant if a deputy finds that the claimant was discharged for misconduct connected with work. § 288.050.2, RSMo Cum.Supp.2010. The legislature has defined "misconduct" as:

[A]n act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his or her employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer.

§ 288.030.1(23), RSMo Cum.Supp.2010.

■ Each of these categories of misconduct requires "an element of culpability or intent." *Williams v. Enter. Rent–A–Car Shared Servs., LLC*, 297 S.W.3d 139, 142 (Mo.App.2009). Thus, while an employee's violation of an employer's work rule may justify the employee's discharge,

"it does not in and of itself warrant a determination of misconduct that would disqualify the employee from receiving unemployment benefits." *Dobberstein v. Charter Commc'ns, Inc.*, 241 S.W.3d 849, 852 (Mo.App.2007). "Poor workmanship, lack of judgment, or inability to do the job do not disqualify a claimant from receiving benefits on the basis of misconduct." *Berwin v. Lindenwood Female Coll.*, 205 S.W.3d 291, 295 (Mo.App.2006). Likewise, accidents or negligence, without a showing of willful intent, do not rise to the level of misconduct under section 288.030.1(23). *Ahearn v. Lewis Cafe, Inc.*, 308 S.W.3d 294, 297 (Mo.App.2010). Rather, to establish misconduct, the employer must prove "that the employee willfully disregarded the employer's interest or that he knowingly acted against the employer's interests." *Id.*

■ Wooden argues in his first point that the Commission's factual findings were insufficient to support its conclusion that his failure to pick up trash on January 25, 2010, constituted misconduct. The Commission's factual findings in this case read, in their entirety:

The claimant worked for The Summit, Inc., approximately two years as a floor technician. The claimant's rate of pay was $7.25 per hour. The claimant's last day of work was January 25, 2010. The employer discharged the claimant because the trash had not been picked up around the building when the administrator arrived at work at 7:40 a.m. on January 25, 2010. Picking up the trash was one of the claimant's job duties. The claimant had been given specific instructions to pick up the trash when he arrived at work at 7:00 a.m. each morning approximately four weeks prior to January 25, 2010, when he was given a warning. The employer discharged the claimant on January 25, 2010.

These findings do not address Wooden's culpability or intent. None of the findings indicate that Wooden's failure to pick up the trash found by the administrator on January 25, 2010, constituted an act of wanton or willful disregard of The Summit's interest, a deliberate violation of The Summit's rules, or negligence in such degree or recurrence as to manifest Wooden's culpability, wrongful intent, or evil design.

The Commission's findings resolve only one of the disputed factual issues in the case, namely, that four weeks before he was terminated, Wooden was specifically told to pick up the trash first thing in the morning when he arrived at work. This finding does not resolve whether Wooden's subsequent failure to pick up the trash on the day that he was terminated constituted culpable or intentional behavior, or whether it was simply an act of negligence, poor workmanship, or lack of judgment. There is evidence in the record to support either of these conclusions. The Commission made no credibility determinations, however, and its factual findings do not resolve the conflicts in the evidence on this issue.

The Commission is required " 'to make unequivocal, affirmative findings of fact' " in its decision. *Dolgencorp, Inc. v. Zatorski*, 134 S.W.3d 813, 819 (Mo.App. 2004) (citation omitted). The decision does not need to be in a particular form, but it " 'must provide for intelligent review of the decision and reveal a reasonable basis for the Commission's decision.' " *Id.* (citation omitted). "There cannot be intelligent review of the decision when the Commission fails to address essential factual issues." *Id.* at 819–20. The Commission's scant findings in this case do not support its conclusion that Wooden was terminated for misconduct connected with work, and they do not permit us to intelligently review the decision. Without any

credibility findings or findings of fact concerning Wooden's culpability or intent, we are unable to address Wooden's claim in his second point that the evidence was insufficient to support the Commission's conclusion that his failure to pick up trash on January 25, 2010, constituted misconduct justifying his disqualification from unemployment benefits.

The Division argues that the Commission's findings were adequate to permit review of the decision because we should infer that the Commission found The Summit's evidence credible and draw reasonable inferences from that evidence in support of the Commission's decision. We disagree. Following the Missouri Supreme Court's ruling in *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003), we do not view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award. Instead, we consider the whole record. *Id.* at 222–23. Due to the Commission's failure to make any credibility determinations or to resolve the conflicts in the evidence, the record as a whole would support either that Wooden acted with the requisite culpability or willful intent to establish misconduct or that he acted negligently or with poor judgment warranting his termination but not disqualification from benefits.

We, therefore, reverse the Commission's decision and remand the case to the Commission for further findings of fact.

All concur.