Stanley SHIELDS, Respondent,

v.

PROCTOR & GAMBLE PAPER PRODUCTS COMPANY, Appellant,

and

Division of Employment Security, Respondent.

No. ED 84970.

Missouri Court of Appeals, Eastern District, Division Three.

June 14, 2005.

Cynthia A. Quetsch, Jefferson City, MO, for respondent Labor and Industrial Relations Commission.

Stanley Shields, Chaffee, MO, pro se.

Daniel M. O'Keefe, St. Louis, MO, for appellant.

## OPINION

GLENN A. NORTON, Judge.

Proctor & Gamble Paper Products Company ("P & G") appeals the Labor and

Industrial Relations Commission's determination that Stanley Shields was not disqualified from receiving unemployment benefits. We reverse.

## I. BACKGROUND

P & G decided to downsize its work force as a result of productivity improvements, so it offered its employees voluntary separation packages. P & G had a certain number of packages to offer. It announced that the packages were available to any technician; those who were interested were to request a package. More employees requested packages than were available, so P & G prioritized who would receive an offer. P & G began by prioritizing, in order of seniority, all of the employees who would qualify for regular and early retirement. Then the remaining employees were prioritized by seniority.

Shields had requested a separation package. He had worked as an electrician at P & G for almost 25 years and was eligible for early retirement. By virtue of his seniority, Shields was high enough on the prioritized list of early retirement-eligible employees and was offered a separation package. The separation agreement provided that Shields would voluntarily end his employment with P & G and would receive a cash separation allowance and other benefits. Under the agreement, Shields could revoke his acceptance within seven days of his signature. But if he did not revoke his acceptance within that time, then the agreement would become effective and enforceable by both parties imme-

diately upon the expiration of those seven days. Shields signed the agreement and never revoked his acceptance.[1]

Shields testified that he left P & G because he was going to be assigned to work on a new production line for which he had no formal training. He did not feel comfortable doing that job with only on-the-job training, so he took the separation package.[2] According to Shields, no one told him that he had to take the separation package, "but the plant manager ... said that there was going to be some changes made, they had to get the productivity level at a certain rate so they could cut costs, and if the people didn't want to accept these changes they should only consider the separation packages."

Shields applied for unemployment benefits. P & G sought an eligibility determination, arguing that Shields had voluntarily retired. A deputy for the Division of Employment Security determined that Shields was not disqualified from receiving benefits because he had voluntarily quit with good cause attributable to P & G's requirement that he work on the new line without proper training. P & G appealed to the appeals tribunal for the Division, contending that Shields voluntarily quit under the separation agreement and that work was still available to him if he had chosen not to quit. Shields and a P & G human resources manager testified at the hearing, after which the appeals tribunal made the following findings of fact:

The employer was in the process of reducing its work force by offering employees an option of accepting a separa-

1. Shields signed the agreement on May 13th, and thus, by its terms, the agreement became effective on May 20th. The agreement did not require P & G's signature to be effective, but P & G did sign it on May 28th. Neither party challenges the validity or enforceability of this agreement; nor is there any claim that P & G did not honor its obligations under the agreement.

2. Although it is undisputed that Shields was going to be transferred to a new line and would receive only on-the-job training, P & G points out that on his exit-interview questionnaire, Shields did not cite this as his reason for leaving.

tion package. Employees who chose the separation package have not been replaced by other employees. The employer's process consisted of allowing the most senior of its employees the package option first. The process continued to lower level seniority employees as needed to reach its staffing level goal. The claimant chose to accept the employer's offer of a separation package. It concluded that P & G intended to reduce its work force because it did not have enough work for all of its employees; the fact that P & G used separation packages to achieve this reduction did not change the intent. Thus, the tribunal concluded, Shields's unemployment resulted from lack of work. The tribunal held that Shields was discharged, not for misconduct, and that he was not disqualified from receiving benefits. P & G appealed to the Commission, again contending that Shields was not discharged, but had voluntarily quit under the separation agreement. The Commission affirmed and adopted the determination of the appeals tribunal. P & G appeals to this Court.[3]

## II. DISCUSSION

### A. Standard of Review

■ Our review of the Commission's decision in an unemployment compensation case is governed by Article 5, Section 18 of the Missouri Constitution and section 288.210 RSMo 2000.[4] *Winco Manufacturing, Inc. v. Partee*, 141 S.W.3d 34, 37 (Mo.App. E.D.2004). We may modify, reverse, remand for rehearing, or set aside the Commission's decision only where: (1) the Commission acted without or in excess of its powers; (2) the decision was procured by fraud; (3) the facts found by the

Commission do not support the award; or (4) there was no sufficient competent evidence in the record to warrant the making of the award. Section 288.210. In the absence of fraud, the Commission's factual findings are conclusive and binding on this Court if supported by competent and substantial evidence. Section 288.210. "Our function is to determine whether the Commission, based upon the whole record, could have reasonably made its findings and reached its result." *Winco*, 141 S.W.3d at 37.

■ Neither party contends that the Commission's findings of fact were procured by fraud or are unsupported by the evidence. Rather, the only issue is whether the Commission reached the correct conclusion of law as to the nature of Shields's separation from employment. This Court is not bound by the Commission's conclusions of law or its application of the law to the facts. *Id.* Further, where, as here, there is no dispute about the essential facts[5] and the issue is the application of the statute to virtually uncontroverted facts, the issue is one of law. *Id.* We find that on the whole record in this case, the Commission's conclusion that Shields was discharged is erroneous, and this error of law requires reversal.

### B. Cause of Separation

■ Under section 288.050.1, a claimant is not eligible for unemployment benefits if he voluntarily leaves employment without good cause attributable to the work or the employer. One leaves work voluntarily, as opposed to being discharged, when he leaves of his own accord and volition. *Moore v. Swisher Mower & Machine Company, Inc.*, 49 S.W.3d 731,

---

3. The Division has filed a respondent's brief; Shields has not.

4. All statutory references are to RSMo 2000.

5. The apparent inconsistency between Shields's testimony and his exit-interview questionnaire relating to his reason for quitting was not addressed by the Commission and need not be resolved for our disposition.

737 (Mo.App. E.D.2001). "[J]udicial interpretations of the unemployment statutes have required that an employee not have *caused* his dismissal by his wrongful action or inaction or his choosing not to be employed." *Missouri Division of Employment Security v. Labor & Industrial Relations Commission of Missouri*, 651 S.W.2d 145, 149 (Mo. banc 1983). The causation envisioned by the statutes "is that having as its direct and immediate consequence the claimant's unemployment." *Id.* at 150. When unemployment occurs in the context of the employer's attempt to downsize through a voluntary separation program, causation depends on whether the final act needed to effectuate separation was committed by the employee or by the employer. *See id.; see also St. Joseph's Health Center v. Missouri Labor and Industrial Relations Commission*, 768 S.W.2d 123, 125 (Mo.App. W.D.1988).

In *Missouri Division of Employment Security*, the employer announced that certain jobs would be eliminated on a specific date and sought volunteers—who otherwise would have been entitled to keep their jobs because of seniority—to be laid off. *Id.* at 146, 150. The employer then selected which of the volunteers would be laid off according to the employer's perceived needs. *Id.* Only those volunteers who were not seen as necessary for effective operation of the plant were selected for layoff. *Id.* "The claimants' volunteering for layoff did not have their unemployment as its *direct* and *immediate* result. A further event—the *employer's* choosing them for layoff—was required." *Id.* Thus, the Court found that the claimants had left work voluntarily with good cause attributable to the employer and were not barred from receiving unemployment benefits. *Id.*

In *St. Joseph's Health Center*, the employer announced that it was downsizing and offered cash bonuses in exchange for voluntary resignations. 768 S.W.2d at 124. The employer explained that resignation was voluntary, that the employer was not trying to force anyone to quit and that the decision whether or not to resign was entirely up to the employee. *Id.* There was no evidence that the employer sought to reduce its work force by any particular number and no evidence that it had threatened involuntary layoffs or otherwise pressured employees to resign. *Id.* at 125. Although only the first 15% of employees in each department were allowed to apply for resignation, there was no evidence that the employer had to approve the application. *Id.* So long as the applicant was within that 15%—as was the claimant in that case—resignation and the payment of the bonus was automatic without further action by the employer. *Id.* The Western District concluded that, unlike the situation in *Missouri Division of Employment Security*, there was no action on the part of the employer in laying off the claimant and her unemployment resulted solely from her voluntary resignation. *Id.* at 126. The fact that bonuses were offered to encourage resignation did not change the voluntary nature of the claimant's separation. The claimant had the choice to remain employed, but she accepted the offer of resignation and received the bonus instead. *Id.* at 127. "There was nothing in her resignation that was attributable to her work or her employer. There was no evidence that her resignation was anything but voluntary. The evidence is completely devoid of any good cause for [the claimant] leaving her employment except for her own desire to accept the offer of [the employer] and voluntarily resign." *Id.*

■ Here, at the time the separation packages were offered, P & G had no plans to implement involuntary layoffs if the separation packages did not achieve the desired reduction in work force. P & G had to prioritize who would receive an offer because more employees requested them

than P & G desired to offer at that time. But prioritizing was the last decision in this process that was made by P & G. If the employee was high enough on the seniority list, then he would be offered a separation package without meeting any further selection criteria established by P & G. Once the separation package was offered, it had to be accepted by the employee to effectuate termination. The decision to accept or reject the offer was entirely up to the employee. In fact, the P & G manager testified that 20% of those who were offered the separation package rejected it and kept their jobs. There is no evidence that P & G threatened involuntary layoffs, intended to reduce its work force by any certain number involuntarily, or otherwise pressured Shields or other employees to request or accept the offer of separation. Once Shields accepted the offer by signing the separation agreement, the agreement automatically became effective seven days later because he did not revoke his acceptance. As in *St. Joseph's*, P & G made no further selection for separation from among those who accepted its offer, and no further action by P & G was required to effectuate separation. Unlike the claimants in *Missouri Division of Employment Security*, Shields's act of accepting the separation agreement had as its direct and immediate consequence his unemployment. The Commission's reliance on P & G's intent to reduce its work force is misplaced because, despite that intention, Shields had the choice to remain employed. *See St. Joseph's*, 768 S.W.2d at 126–27. Therefore, Shields's separation was voluntary.

The Division contends that even if the separation was voluntary, Shields quit for good cause attributable to P & G's requirement that he work on a new line without formal training. Even assuming that this was the real reason that Shields quit, *see* note 5, *supra*, there is no evidence that he did so in good faith. To establish the good faith element of good cause, the employee must prove that he made an effort "to resolve the dispute before resorting to the drastic remedy of quitting his job." *Winco*, 141 S.W.3d at 38. The record contains no evidence that Shields made any effort to address his alleged concerns about the lack of training with P & G before he quit. The Division's suggestion that no such effort was required because P & G "made it clear" that an employee's only recourse for dissatisfaction with P & G's changes was the separation package is belied by the record. Shields testified himself that no one told him he had to take a separation package; rather, according to Shields, P & G merely told employees that they should "only consider" the separation package.

In sum, Shields's act of accepting P & G's offer of separation was voluntary and did not constitute a discharge. Moreover, his acceptance of the offer directly and immediately caused his unemployment without further action by P & G. Thus, Shields voluntarily quit without good cause attributable to his employer or the work, and he is disqualified from receiving benefits. Point I is granted.[6]

## II. CONCLUSION

The Commission's determination of eligibility is reversed.

CLIFFORD H. AHRENS, P.J. and NANNETTE A. BAKER, J. concurring.

---

**6.** P & G's other point on appeal, asserting an alternative basis for disqualifying Shields from receiving benefits, is moot.