Jonathan DAVIS, Claimant–Appellant,

v.

The SCHOOL OF THE OZARKS, INC., d/b/a College of the Ozarks, and Division of Employment Security, Respondents–Respondents.

No. 26882.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 28, 2006.

Motion for Rehearing and Transfer Denied March 22, 2006.

Application for Transfer Denied May 2, 2006.

Timothy S. Davis, Branson, for Appellant.

Virginia L. Fry, Jennifer R. Growcock, Blackwell Sanders Peper Martin, LLP, Springfield, for respondent The School of the Ozarks, Inc., d/b/a College of the Ozarks.

Marilyn Green, Cynthia Quetsch, Jefferson City, for respondent Division of Employment Security.

KENNETH W. SHRUM, Presiding Judge.

Jonathan Davis ("Claimant") appeals from an order of the Labor and Industrial Commission ("Commission") that denied his claim for unemployment benefits. His brief contains four points of alleged Commission error. We affirm.

Claimant previously worked for The School of the Ozarks, Inc., d/b/a College of the Ozarks ("College") as a biology professor. This employment was pursuant to a series of one year, probationary contracts. Claimant's last contract with College was

for the 2003–04 school year and ended May 31, 2004.

College notified Claimant via letter dated December 18, 2003, that his contract for the 2004–05 year would not be renewed. A separate letter informed Claimant he was suspended (with pay) for the spring 2004 semester. This happened after Claimant sent out anonymous e-mails, memorandums, and letters that questioned whether a doctorate degree claimed by Larry Cockrum (College's dean of administration) was a "diploma mill" degree.

College's reasons for sending Claimant the non-renewal letter and suspension notice were that (a) Claimant did not use grievance procedures set forth in College's Faculty Handbook to raise the "diploma mill" issue and (b) Claimant's use of College's computers to send the subject e-mails violated established policy regarding computer usage. Claimant admitted he knew of the grievance procedures, but maintained he was excused from using them because of the subject at issue, namely, "unethical conduct or fraud by a top administrator of the college."

Once Claimant learned of College's action regarding his employment, he filed three grievances per procedures afforded him by the faculty handbook. During the pendency of these grievances, College's president sent Claimant a letter dated March 2, 2004. Therein, College offered to keep Claimant employed, provided he fulfilled certain conditions.[1] Claimant failed to respond to the letter. That failure is why Commission found Claimant left his employment voluntarily without good cause attributable to his work or his employer.

Because of its relevance, we reproduce parts of the March 2, 2004, letter, as follows:

"I propose the following nonnegotiable resolution of these matters."

. . . .

"Second, I [College president] will have your probationary contract issued for the next academic year in the usual manner. This contract will be issued with the strict condition that you will review the Faculty Handbook, have a thorough knowledge of its contents, and agree to follow the Handbook in the future. If you successfully complete your probationary period, I will have the record of your suspension and nonrenewal removed from your file."

. . . .

"As you know, contracts are being issued this week, so I need your response to this proposal no later than Thursday, March 4th."[2]

1. The document was a multi-paragraph letter that dealt with issues other than renewal of Claimant's 2004–05 employment contract. The only "condition" directly related to the offer of a contract for 2004–05 was that Claimant review and be thoroughly acquainted with the faculty handbook and agree to follow the handbook in the future. The Commission found that "was a condition of the claimant's employment all along and [College's] insistence that [Claimant] abide by the rules in the faculty handbook was not such an onerous requirement as would have compelled a reasonably prudent person to give up their only gainful employment." Claimant does not argue to this court that Commission erred in that conclusion.

2. Paragraph First of the letter offered to end Claimant's suspension "effective the date that you tell me you accept my proposal." Additionally, paragraph First informed Claimant that he would not be teaching for the remainder of the 2003–04 school year because his classes had already started, but he would be assigned a project. The letter continued, "It might run into the summer, but arrangements could be made for that." Paragraph First then concluded, "We can discuss this later, but my intent is that you would spend the

At the hearing on his claim, Claimant testified he thought the March 2 offer was "too vague," although he admitted never contacting College's president to ask questions or get more details.

Because Claimant never responded to the March letter offering a 2004–05 contract, the grievance procedure continued. That process was completed May 10, 2004, when College's board of trustees ruled its administrators were justified in notifying Claimant of non-renewal of his 2004–05 contact and suspending him for the spring 2004 semester.

Claimant filed for unemployment benefits on June 11, 2004, claiming loss of employment as of May 31, 2004. College timely protested, asserting Claimant's unemployment resulted from misconduct connected with his work. Based on that assertion, College argued Claimant was disqualified for benefits for the period in which he sought them. A deputy for the Division of Employment Security ("Division") agreed with College, finding that Claimant was disqualified for five weeks from June 6, 2004, because of "misconduct connected with work."

Claimant appealed from the deputy's decision. After an evidentiary hearing, the appeals tribunal (per a decision by referee Villines) agreed that Claimant was disqualified for benefits, but found a different reason for disqualification. Specifically, the referee found Claimant ineligible because he quit work voluntarily without good cause attributable to work or the employer. The "quit work" finding was based on Claimant's lack of response to College's March 2, 2004, proposal.[3]

An appeal of this decision was taken by Claimant to Commission. It affirmed the Appeal Tribunal's decision. Claimant's appeal to this court followed.

■■■■ Review is under section 288.210.[4] "Under that section, appellate review in unemployment compensation cases is limited to whether the Commission's decision is supported by competent substantial evidence and authorized by law." *Streitz v. Juneau*, 940 S.W.2d 548, 550[1] (Mo.App. 1997). "The evidence is viewed in the light most favorable to the finding of the Commission and all reasonable inferences drawn therefrom which support the decision." *Id.* at 550[2]. "We defer to the Commission's resolution of witness credibility, and where the Commission, as a trier of fact, has reached one of two possi-

---

remainder of the semester doing needed work for the College."

3. Referee Villines reasoned as follows:

"The letter ... to ... claimant ... on December 18, 2003, and the letter from the president of the college on January 8, 2004, did not sever the claimant's employment relationship with the college. The claimant's employment would not ultimately end until he either pursued the grievance procedures and received a negative result or chose not to pursue the grievance procedure as provided in the faculty handbook.... [T]he letters from Dean Graves and [College's] President ... establish that the claimant was continued on the employment rolls but was suspended from activi-

ties through the remainder of the school year with full salary and benefits...."

"The claimant filed a grievance procedure pursuant to the faculty handbook. By March 2, 2004, the grievance had worked its way through the process and landed on the desk of the college president. The president wrote the claimant on March 2, 2004, and stated that under certain conditions he could remain an employee at his regular pay and benefits. The letter also informed the claimant that his contract would be renewed for the upcoming school year. The claimant rejected this offer. Since claimant rejected the offer to remain employed, he voluntarily left work...."

4. Unless otherwise stated, all statutory references are to RSMo (2000).

ble conclusions from the evidence, this court will not reach a contrary conclusion even if such a conclusion might have reasonably been reached." *City of Branson v. Santo,* 111 S.W.3d 910, 914[4] (Mo.App. 2003).

Claimant's first point maintains Commission committed reversible error because the facts found by Commission do not support denying his claim for benefits. He says this is so because all evidence, from both Claimant and College, shows that Claimant lost his job because he was discharged rather than voluntarily quit; that the only factual issue before Commission was whether he was discharged for misconduct associated with his work. He insists that the words "left work voluntarily" cannot, by any construction, extend to the situation shown by this record.

In pertinent part, section 288.050.1 provides that claimant is "disqualified for waiting week credit or benefits until [he] has earned wages ... equal to ten times [his] weekly benefit amount if the deputy finds: (1) That [he] has *left work voluntarily without good cause attributable to [his] work or to his employer.*" (Emphasis supplied.)

 In urging reversal, Claimant points out that section 288.050.1(1) only has application when a person leaves work of his own accord and volition. *See Moore v. Swisher Mower & Machine Co., Inc.,* 49 S.W.3d 731, 737[8] (Mo.App.2001). Accordingly, an employee will not be held to have left work voluntarily when the employer decides to end the employment relationship. *Sokol v. Labor and Industrial Relations Comm'n,* 946 S.W.2d 20, 25 (Mo. App.1997). Moreover, the "voluntary quit" provision in section 288.050.1 is one that is

to be strictly and narrowly construed in favor of finding an employee entitled to compensation. *Moore,* 49 S.W.3d at 739[18].

While these are well-established general principles of Missouri employment security law, their applicability, as with many such rules, is fact driven and tempered by other considerations. *Dept. of Nat. Resources v. Lossos,* 960 S.W.2d 537, 540[7] (Mo.App. 1998) (holding "the phrase 'good cause' has no precise meaning; it depends on the facts of each case").

Here, uncontradicted evidence shows Claimant was suspended (with pay) beginning January 8, 2004, and was notified by a separate letter that his teaching contract would not be renewed for the 2004–05 school year. If those facts stood alone, Claimant's point would have merit and remand would result so Commission could decide the "discharge for misconduct" issue. That, however, is not the whole story.

While Claimant was still employed, i.e., under suspension but being paid, he contested College's announced intent to end his employment.[5] He did this by filing grievances concerning College's conduct. When his grievances reached the college president level, he (the president) wrote Claimant on March 2, 2004, to say that he would have Claimant's "probationary contract issued for the next academic year in the usual manner." This was routine in the sense that Claimant's employment with College had always been via a one-year probationary contract. Had Claimant signed the contract, he would have remained employed. More than that, the offer was for a 2004–05 contract "in the

---

**5.** Claimant's Point IV argument includes a contention that he did not remain employed during his suspension period (even though paid in full) because he was not performing

the work for which he was hired. We have rejected that argument for reasons spelled out in our discussion of Point IV.

usual manner." However, Claimant never responded to College's March 2 letter. Claimant's non-response was the basis for Commission's finding that Claimant quit without good cause and was, therefore, ineligible for benefits. *See* note 3.

■ Claimant's Point I argument focuses on this Commission finding:

"Based upon the claimant's nonresponse [to College's March 2, 2004, offer of employment for school year 2004–05], the president forwarded the claimant's grievances to the Board of Trustees. On May 10, 2004, the Board of Trustees wrote ... and notified the claimant generally that since he had rejected the president's offer to return to work it denied his grievances and upheld the actions of his suspension and nonrenewal."

By quoting this and ignoring all else in Commission's decision, Claimant asserts that "[g]iven these findings ... by the Commission, it is evident that the College chose to terminate [Claimant] rather than have him continue to work under his existing contract." Claimant then cites *Sokol,* 946 S.W.2d 20 (which he says has analogous facts), to argue that like the employee in *Sokol,* he (Claimant) wanted to "continue working under his current contract of employment." He insists it was "College that chose to suspend his duties[ ]" and it was "College that chose not to renew his contract for the 2004–2005 academic year."

There are fatal flaws in this argument. First, Claimant's reliance on *Sokol* is misplaced. The *Sokol* court found the employee there "was discharged for refusing to accept a new contract which ... substantially changed his terms of employment." 946 S.W.2d at 25. Those are not the facts of this case. Here, the March 2 offer to Claimant did not change the terms of his employment for the 2004–05 academic year.

Second, Claimant's argument focuses solely on what Commission ruled regarding Claimant's grievances. Wholly absent from Claimant's argument is any mention of facts and conclusions that underlie Commission's "voluntary quit" finding. As a consequence, his argument is without a "causation" analysis, i.e., what caused Claimant's separation from employment effective May 31, 2004.

■ Missouri's unemployment statutes have been interpreted as disqualifying an employee for benefits if the employee " '*caused* his dismissal by his wrongful action or inaction or his choosing not to be employed.' " *Shields v. Proctor & Gamble Paper Products,* 164 S.W.3d 540, 544[6] (Mo.App.2005) (quoting *Missouri Div. of Employment Sec. v. Labor and Ind. Rel. Comm'n. of Mo.,* 651 S.W.2d 145, 149 (Mo. banc 1983)). "The causation envisioned by the statutes 'is that having as its direct and immediate consequence the claimant's unemployment.' " *Id.* at 544[7]. Sometimes, the "causation depends on whether the final act needed to effect separation was committed by the employee or by the employer." *Id.*

Admittedly, the "causation" analysis in *Shields* was in the context of an employer's attempt to downsize its work force through a voluntary separation program. We acknowledge those are not the facts of this case. Even so, we find the *Shields* analysis apropos and dispositive. Claimant had the choice of remaining employed after May 31, 2004. He could have done so by responding affirmatively to College's March 2 letter concerning a contract for the 2004–05 school year. He opted not to do that by ignoring the letter and continuing with his grievances. Claimant's nonresponse to College's letter caused Claimant's unemployment effective May 31, 2004, without further action by College.

In so finding, we acknowledge that once Claimant rejected College's offer, the grievance process went forward and ultimately College resolved the grievances adversely to Claimant. Under the circumstances, College had no other choice; it had to adjudicate the grievances. However, College's grievance decision did not have "as its direct and immediate consequence the claimant's unemployment;" rather his unemployment as of May 31, 2004, was a "direct and immediate" consequence of Claimant's non-response to a job offer for the 2004–05 academic year. *See Shields*, 164 S.W.3d at 545. Commission did not err when it so found. Point I is denied.

■ Claimant's second point charges Commission committed reversible error by entering a final award denying him benefits based on an issue that was not tried and about which he had no notice, (the "voluntary quit" issue). He says since the only issue submitted and tried related to his alleged misconduct connected with work, Commission violated his constitutionally guaranteed right to due process when it denied him benefits on a "voluntary quit" theory, something he knew nothing about.

■ Certainly, procedural due process (mandated by the Fourteenth Amendment to the Federal Constitution and Article I, Section 10 of the Missouri Constitution) restrains a state from taking away an entitlement, whether the entitlement is denominated a "right" or a "privilege." *Hill v. State Dept. of Public Health and Welfare*, 503 S.W.2d 6, 10 (Mo.banc 1973) (citing *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).[6]

Here, however, Claimant's due process argument is without merit. This follows because the record shows Claimant was repeatedly notified that "voluntary quitting" was an issue in his case. To explain, Claimant's appeal was first scheduled for hearing August 13, 2004. That scheduled hearing was continued and the case was reset for August 31, 2004. The appeals tribunal then removed the case from its August 31 setting and rescheduled it for September 28, 2004. Each time his case was scheduled—three times in all—Claimant was given written notice in advance (via a form) that included the following:

"*Issue(s) For This Hearing:*

288.050.1(1), 288.050.2, RSMO: Evidence will be taken regarding the separation from work. The decision will determine *if the claimant left work voluntarily without good cause attributable to work* or was discharged for misconduct connected with the work." (Emphasis supplied.)

More than that, the referee's remarks as he started the hearing served as additional notice that the "voluntary quit" issue was in the case. Specifically he announced, "The issues present for consideration are *whether [Claimant] voluntarily left his employment, and if so, was that with good cause attributable to his work or employer,* or was he discharged, and if so, was that for misconduct connected with his work." (Emphasis supplied.) Following his opening remarks, the referee asked Claimant, "Do you have any questions concerning either the purpose for the hearing or the procedures we'll follow?" Claimant answered, "No sir. Not at this time." Then, during the hearing, Claimant was questioned about and gave answers bearing on the voluntary quit issue, yet he never opposed this line of questioning, nor did he claim he was unaware this was an issue, nor did he ask for a continuance to prepare his case on this issue. These facts

6. The *Sherbert* court involved a disqualification for unemployment compensation.

disprove Claimant's claim of inadequate notice and denial of his due process rights.

■ In so stating, we do not ignore what the record shows, namely, that both College and Claimant focused their evidentiary efforts and arguments exclusively on the issue of whether Claimant had been discharged for misconduct. That, however, did not preclude Commission from considering other relevant issues. Although the language and terms used by the parties to describe cessation of a claimant's employment may be instructive, " 'the relevant facts and circumstances are controlling.' " *Worley v. Div. of Employment Sec.*, 978 S.W.2d 480, 483[10] (Mo.App.1998) (quoting *Price v. Labor and Indus. Relations Comm'n of Missouri*, 811 S.W.2d 457, 459 (Mo.App.1991)). The facts and circumstances show Claimant's due process argument lacks merit.

■ We turn now to Claimant's Point II argument for reversal based on 8 CSR 10–5.015(10)(C). This regulation provides:

"If the hearing officer believes that the deputy's determination did not apply the correct provision(s) of law to the factual situation presented, the hearing officer, after informing the parties, may expand or otherwise alter the hearing to include the correct issues involved. If one (1) or more parties object to the change in the hearing, the hearing officer shall continue the hearing to allow the parties time to prepare for the proper issues."

Claimant argues the referee did not comply with this regulation, in that he failed to inform the parties he was expanding or altering the hearing to include the voluntary quit issue. He insists that such non-compliance requires reversal. We disagree. On this record, the regulation has no application. This follows because the issue that Claimant says should have triggered an expansion or alteration of the hearing, i.e., whether Claimant voluntarily quit work, was one that was in the case and was an issue Claimant expected, or should have expected, to be part of the hearing. This follows because it was an issue mentioned in three pre-hearing notices, it was part of the referee's opening statement, and it was the subject of testimony at the hearing.

In sum, we find Claimant was not denied due process, the referee did not violate 8 CSR 10–5.015(10)(C) and Commission did not act in excess of its powers when it affirmed the appeals tribunal's decision. Point II is denied.

Claimant's third point urges reversal because Commission "improperly" shifted to Claimant "the burden of proving that he did not voluntarily quit his employment." This argument begins with the premise that the only issue before the appeals tribunal and Commission was whether Claimant was discharged for misconduct connected with work. Claimant then points out that when an employer defends by alleging employee misconduct caused the separation, the burden shifts to the employer to prove misconduct connected with work. *Hoover v. Community Blood Center*, 153 S.W.3d 9, 13[8] (Mo.App.2005). With that said, Claimant's argument appears to be that once College alleged misconduct as a defense, the burden of proof shifted to College as to all issues; that College, by alleging misconduct, assumed the burden of proof as to the voluntary quit issue as well; and reversal is mandated because Commission improperly imposed the burden of proof on Claimant as to the voluntary quit question.

■ To state this argument shows its fallacy. As explained earlier, termination for misconduct was not the only issue before the appeals tribunal; both discharge for misconduct and voluntary

quit issues were in the case. As a person seeking unemployment compensation, Claimant bore the burden of proving his eligibility for benefits. *Shelby v. Hayward Baker, Inc.*, 128 S.W.3d 164, 170[4] (Mo. App.2004). When the issue is whether an employee was discharged or quit, the employee—not the employer—bears the burden of proving he was discharged and did not voluntarily quit. *Kansas City Club v. Labor and Indus. Relations Comm'n*, 840 S.W.2d 273, 275 (Mo.App.1992).

Here, Claimant's premise is that the burden of proof shifted to College and remained there *on all issues* because it alleged Claimant was discharged for misconduct. That is simply not the law. More than that, the referee was not bound by that allegation. *See Madewell v. Div. of Employment Sec.*, 72 S.W.3d 159, 165 (Mo.App.2002). As explained earlier, what the parties say or allege about the cessation of an employment may be instructive, but it is "the relevant facts and circumstances" that control. *Worley*, 978 S.W.2d at 483[10]. The facts and circumstances here support Commission's conclusion that Claimant voluntarily quit his employment without good cause.

In sum, Claimant had the initial burden to prove benefit entitlement and this included proving whether he was discharged or quit. Had Claimant proved he was discharged, the burden would have shifted to College to prove Claimant was discharged for misconduct connected with his work. However, the evidence supports a finding that Claimant voluntarily quit; consequently, Commission did not improperly shift the burden of proof and therefore did not act in excess of its powers. Claimant's third point is denied.

 Claimant's fourth and final point has multiple parts. It starts with the assertion that Commission erred, as a matter of law, in finding that Claimant quit voluntarily on March 4, 2004. Claimant insists that his employment with College could not have ended March 4, 2004, as Commission found. His argument goes as follows.

Section 288.034.1, a provision in Missouri's Employment Security Law, provides that "[e]mployment means service." Relying on that, Claimant says an employment relationship between College and him on March 2, 2004, could only have existed if he had been performing services for College on that date. Continuing, he says his employment was suspended after December 18, 2003; consequently, he performed no further services for College and could not have had an employment relationship with College after that date. In a related argument (also based on section 288.034.1), Claimant asserts his employment could not have ended March 4, 2004, "because, as a matter of law, nothing happened on March 4th that changed whether he was performing service for the College." Claimant's arguments are not persuasive. Although Commission's decision contains language that can arguably be read as finding that Claimant's employment relationship with College ended March 4, 2004 (when he failed to respond to College's employment offer), the essence of Commission's finding is that Claimant's non-response by March 4, 2004, was a voluntary quit as of May 31, 2004. Several factors support this conclusion.

To start with, Claimant was paid wages and benefits under a specific contract for employment that did not end until May 31, 2004. Additionally, College provided Claimant an office, computer resources, an e-mail account, and Internet access during the December 2003, to May 31, 2004, period. During this time, Claimant considered himself as continuing to have an employment relationship with College. At the hearing Claimant testified he was still employed by college from January 1, 2004

thorough May 31, 2004. Claimant concedes in his brief that he "had a teaching contract that ran through May 31, 2004[ ]" and was paid his salary per that contract. These are facts that support a finding that Claimant was not discharged May 31, 2004, but rather voluntarily left College's employment effective May 31, 2004, by not responding to College's March 2 letter by March 4, 2004.

▮ We further note that to the extent Commission erred in its finding about when the employment relationship ended, it is an error without prejudice to Claimant. This is so because a Commission decision that reaches the right result will not be overturned because a wrong or insufficient reason was given for the ruling. *Lauderdale v. Div. of Employment Sec.*, 605 S.W.2d 174, 178[8] (Mo.App.1980).

Another part of Claimant's Point IV maintains that, as a matter of law, Claimant could not have quit voluntarily (as Commission found) because College's March 2 letter did not amount to an offer of continued employment; that it was merely an "offer to make an offer" of employment and, as such, it "had no contractual significance." ·

It is in this context that Claimant makes his only complaint about the "nonnegotiable resolution" part of the March 2 letter. Moreover, this part of Claimant's brief contains his only complaint about uncertainty in his proposed work duties for the remainder of his 2003–04 contract or about summer work. However, Claimant's brief is devoid of any argument that those parts

of the March 2 letter constituted good cause attributable to College for Claimant's decision not to accept its terms.[7]

Instead, what Claimant argues in his brief is that an employee cannot be held to have "voluntarily quit" per Missouri's Employment Compensation Law by ignoring an offer or notice of continued employment unless the offer has the specificity and definiteness that would make a contract had it been accepted. With that as his premise, Claimant uses the "nonnegotiable resolution" language, the less than specific comments about staff duties through May 31, 2004, and remarks about a possible summer project as examples of why a binding contract would not have resulted had he unequivocally responded affirmatively to the March 2 letter.[8] Claimant concludes his argument on this by writing "the Commission erred in its application of the law to the facts ... [because Claimant's] employment could not have terminated by reason of him rejecting an offer of continued employment since no such offer was made."

We disagree. It is clear that an offer of continued employment was made. The dissent's view is that the uncertainties in the March 2 letter provided Claimant with good cause not to respond to the letter. However, that is not what Claimant argued.

▮ We deem it significant that Claimant does not support the argument he does make with any authority, that is, he cites no authority for the notion that he could not, as a matter of law, be held to

---

7. Although that is the basis for what the dissent would find, that is not what Claimant argued in his brief.

8. Any doubt that Claimant's argument was rooted in contract law—not unemployment compensation law—is removed by noting that the only authority he cites is *Prenger v. Baumhoer*, 914 S.W.2d 413 (Mo.App.1996). *Pren-*

*ger* is a contract case. It has nothing to do with unemployment law. Claimant cites it for the proposition that " 'there can be no contract so long as the essential terms thereof are reserved for the future determination of both parties.' " *Id.* at 415 (quoting *Jenks v. Jenks*, 385 S.W.2d 370, 376 (Mo.App.1964)).

have voluntarily quit by ignoring the March 2 letter because it did not have the specificity and definiteness that would make a contract had it been accepted. This is not surprising as it is an argument that cannot be reconciled with the "good cause" element of an employment compensation case.

> "An employee has good cause to quit his employment if his conduct is consistent with what a reasonable person acting in good faith would do in a similar situation. The circumstances motivating an employee to quit must be caused by external pressures so compelling that a reasonably prudent person would be justified in terminating his employment. Good faith is an essential element of good cause, and to establish it the employee must prove that he made an effort to resolve the troublesome situation before terminating the job."

*Lossos,* 960 S.W.2d at 540[8–10] (citations omitted).

■ What we glean from *Lossos* and the many cases that discuss "good faith" as an element of good cause is this: If an offer of continued employment is too vague or lacking in specificity to create a contract by the employee's acceptance of what was offered, that fact, standing alone, does allow an employee as a matter of law to ignore the offer and enter the ranks of the compensated unemployed. When those are the facts, the relevant question is what would a reasonable person acting in good faith have done in a similar situation? *Id.* at 540[8]. Regarding this case, the relevant question is would a reasonable person have contacted College's president in an attempt to learn what he meant by the phrase, "I will have the probationary contract issued for the next academic year in the usual manner." The Commission found Claimant did not act in good faith as he did not "avail himself of [the] opportuni-

ty" to discuss the proposal with the college president. The record supports that finding; consequently, this part of Claimant's Point IV is denied.

■ The third prong of Claimant's last point urges reversal by saying that the timetable imposed by College, i.e., a letter dated March 2 that demanded an answer by March 4, was the kind of arbitrary employer behavior that was condemned in *Sokol* and found by that court to justify a voluntary quit. We disagree. The facts in *Sokol* distinguish it from this case.

As noted earlier, the employer in *Sokol* offered a new contract on altered terms, such as a change in duties. That did not happen here. Moreover, the *Sokol* employer violated a term of the claimant's current contract which required the employer to give the claimant thirty days notice of a change in employment terms. In contrast, here the probationary contract tendered would have been on "the same terms" as were in Claimant's 2003–04 probationary contract. Finally, Claimant did not have to sign the new contract within hours of learning of College's proposal as occurred in the *Sokol* case. It is reasonable to infer from the evidence that all Claimant had to do was respond to College's offer and his probationary contract would have been issued to him in the "usual manner."

We conclude that Claimant failed to meet his burden of proving 'good cause' because his decision not to respond to College president's letter—without conferring with College to resolve any questions raised by a lack of specificity in the March 2 letter—was not consistent with what a reasonable person, acting in good faith, would have done in a similar situation. Point IV is denied.

The Commission decision that Claimant was disqualified from receiving unemploy-

ment compensation because he left work voluntarily without good cause attributable to his work or his employer is authorized by law, is supported by competent and substantial evidence on the whole record, and is not against the overwhelming weight of the evidence. Accordingly, Commission's decision is affirmed.

BATES, C.J., concurs.

GARRISON, J., dissents in separate opinion.

PHILLIP R. GARRISON, Judge, dissenting.

I respectfully dissent. The decision of the appeals tribunal adopted by the Commission in its order stated, in pertinent part:

> By March 2, 2004, the grievance had worked its way through the process and landed on the desk of the college president. The president wrote [C]laimant on March 2, 2004, and stated that *under certain conditions* he could remain an employee at his regular pay and benefits. The letter also informed [C]laimant that his contract would be renewed for the upcoming school year. [C]laimant rejected this offer. Since [C]laimant rejected the offer to remain employed, he voluntarily left work and his voluntary separation from work is deemed to have occurred effective March 4, 2004, same being the date upon which he was to respond to the president of the college.
>
> The issue remaining is whether [C]laimant quit work with good cause attributable to his work or employer. [C]laimant testified that he did not accept the offer because his assignment would be altered. The referee finds no merit in this position. The president of the college indicates in his letter a reasonable necessity for the variance in duties.

> The school year had very little time left and obviously the courses which normally would have been taught by [C]laimant were already being taught by someone else. [C]laimant was offered other current duties at the college and would return to his regular teaching duties the following school year. The referee does not find that a reasonably prudent person would have quit work over this understandable variance in duties.
>
> . . . .
>
> It also must be stated that, while true, [C]laimant had disagreements with the president's proposal he was given the opportunity to contact the president to try to resolve the differences and, under the Missouri Employment Security Law, he had the obligation to do so. The Missouri Courts have consistently held that before good cause for quitting work can be established it must be shown that an employee acted in good faith in an attempt to reasonably resolve problems before they quit. As stated by the Court in, *American Family Insurance Company v. Hilden*, 936 S.W.2d 207 (Mo.App. W.D.1996)[,] "To demonstrate good faith, a claimant must show that before taking the 'drastic' measure of termination of employment, he or she attempted to remedy the situation or dispute." [C]laimant had an avenue open to discuss the proposal with the college president and he did not avail himself of that opportunity, thus he did not act in good faith and good cause is not established. It is concluded that [C]laimant's voluntary separation from work effective March 4, 2004, was not with good cause attributable to his work or employer. (emphasis added).

Thus, the Commission's order is premised on the conclusion that because Claimant rejected the opportunity to remain employed, he voluntarily left work as of

March 4, 2004 [1]; that his quitting was not for good cause attributable to his work or employer; and he did not act in good faith by attempting to reasonably resolve the problems that led to his departure. Assuming that Claimant's failure to accept the conditions of the president's letter amounted to his voluntary departure, I disagree with the remaining two conclusions.

The law concerning whether an employee is disqualified from unemployment benefits because of leaving work voluntarily was summarized in *Department of Natural Resources v. Lossos*, 960 S.W.2d 537 (Mo. App. S.D.1998). There, a worker received a probationary promotion which the employer later determined he had not successfully completed. *Id.* at 539. He was directed to work at another job location 150 miles from his home and, although the employer offered to reimburse him for travel expenses, he resigned and sought unemployment benefits. *Id.* In affirming the granting of those benefits, this court said:

> An employee effectively disqualifies himself from receiving unemployment benefits if he leaves work voluntarily without good cause attributable to his work or his employer. § 288.050.1(1). Whether an employee has good cause to quit his job is a question of law, and the burden is on the employee to prove its existence. The phrase "good cause" has no precise meaning; it depends on the facts of each case. An employee has good cause to quit his employment if his conduct is consistent with what a reasonable person acting in good faith would do in a similar situation. The circumstances motivating an employee to quit

must be caused by external pressures so compelling that reasonably prudent person would be justified in terminating his employment. Good faith is an essential element of good cause, and to establish it the employee must prove that he made an effort to resolve the troublesome situation before terminating his job. (citations omitted).

*Id.* at 540. There, we held that the employee had good cause to resign and affirmed the granting of benefits. *Id.* at 542. In doing so, we disagreed with the Commission as to the reason the employee was entitled to benefits, but noted that when the essential facts of the case are not in dispute and the parties disagree merely as to what legal conclusions may be drawn from them, such as whether the employee had good cause to quit within the meaning of Section 288.050.1(1), an interpretation or application of law is involved which is within our province to independently review and correct. *Id.*

In this case, the essential facts surrounding Claimant's entitlement to benefits are not in dispute. Rather, one of the determinative issues is whether his failure to accept the conditions of the president's letter amounted to a voluntary quit without good cause attributable to his work or employer. As in *Lossos*, this involves an interpretation or application of law.

It is true that Claimant did not accept the conditions set out by the president in his March 2, 2004, letter by which Claimant could have remained employed by College. I believe, however, that it is necessary to view the letter as a whole. Although the letter offered to have a probationary contract issued to Claimant for the next academic year in the usual man-

---

1. I agree with the majority that Claimant became unemployed as of May 31, 2004, not March 4, 2004. This would be true whether Claimant was discharged or voluntarily quit.

Although Claimant was under suspension as of March 4, 2004, his contract was in force and he was paid through May 31, 2004.

ner, it also contained other significant provisions. It said, *"I propose the following nonnegotiable resolution of these matters."* (emphasis added). It then said:

I will end your suspension effective *the date you tell me you accept my proposal.* Given the semester's progress, your classes will need to continue as they are. *However, I do have a project with which you could help. It might run into the summer, but arrangements could be made for that. We can discuss this later, but my intent is that you would spend the remainder of the semester doing needed work for the College.* (emphasis added).

The letter also stated that the president needed Claimant's "response to this proposal no later than Thursday, March 4th. If you agree, sign below and return to my office. If you do not agree, please let me also know that by Thursday, March 4th because, I plan to forward all three appeals to the Faculty Grievance Committee as provided in the Faculty Handbook."

The conditions of Claimant's reinstatement and opportunity to accept another probationary contract were a part of one package.[2] In order to be offered another probationary contract, it was necessary that Claimant accede to the other terms of the letter. That included performing an unidentified "project" for an undetermined period of time, possibly past May 31, 2004, the last date for which Claimant was to be compensated by College. Thus, the scope of the work to be performed by Claimant was undetermined as was the time requirements and whether he would be compensated for all of it.

Whether these uncertainties amounted to good cause is a legal issue on which we do not defer to the Commission. *Sokol v. Labor and Indus. Relations,* 946 S.W.2d 20, 26(Mo.App. W.D.1997). The phrase "good cause" has no fixed or precise meaning, but is judged by the facts of each case. *Id.* The standards by which it is judged can be summarized as an objective determination of what a reasonable person would do in the same or similar circumstances. *Id.* Absent discriminatory, unfair or arbitrary treatment, mere dissatisfaction with working conditions does not constitute good cause for quitting unless the dissatisfaction is based on a substantial change in wages or working conditions from those in force at the time a claimant's employment began. *Id.* at 26–27 (quoting *Charles v. Missouri Div. of Employment Sec.,* 750 S.W.2d 658, 661 (Mo.App. W.D. 1988)).[3]

In my view, Claimant's failure to accept the terms of the president's letter, given its nebulous description of what he would be required to do, for how long, and whether he would be compensated for all of it, was compatible with what a reasonable person would do under the circumstances. Those circumstances included what was obviously a contentious standoff between the parties over whether Claimant should be punished, or perhaps termi-

---

**2.** No issue is raised in this appeal about whether the failure to renew a probationary contract is a circumstance which would qualify as a termination for unemployment compensation purposes.

**3.** In his brief, Claimant argued the following, among other things:

Following the decision in *Sokol,* 946 S.W.2d at 27, for an employer to demand that an employee—or former employee— immediately accept a vague, "nonnegotiable resolution," is the sort of behavior that justifies a voluntary quit. The timetable imposed by the College was completely arbitrary. That the letter was mailed at the earliest on March 2nd and demanded a response by March 4th suggests a lack of good faith—and such a lack of good faith as would justify an employee not responding within the hours-long time limit.

nated, for his involvement in reporting to the Board of Trustees of the College rather than following a faculty grievance procedure, his belief that a Ph.D. held by one of its administrators was obtained from a "diploma mill."

It is true that Claimant did not attempt to discuss the terms of the March 2, 2004, letter with the president, and that cases such as *Lossos* impose a duty on an employee who quits employment to prove that he made an effort to resolve the situation before leaving the job. In my opinion, that requirement is inapplicable here and does not disqualify Claimant.

The president's letter specifically stated that he was proposing "the following nonnegotiable resolution of these matters." While the president also said, "We can discuss this later," with reference to the unspecified duties, time requirements, and compensation after May 31, 2004, it is clear that Claimant was being required to accept or reject the terms of the letter without the benefit of any such discussions. Not only did the letter say that the terms were nonnegotiable, it also required acceptance or rejection within two days. According to the letter, there were to be no discussions before Claimant had to decide whether to accept or reject its terms even though some of its terms were nebulous at best. There was also evidence that Claimant received the letter only one day before the deadline for accepting it. Under these circumstances, I do not believe we can classify Claimant as having failed to act in good faith by not availing himself of the opportunity to discuss the proposal with the president.

I do not agree that *Shields v. Proctor & Gamble Paper Products*, 164 S.W.3d 540(Mo.App. E.D.2005), is dispositive of issues in this case. As indicated by the majority, *Shields* stands for the proposition that, to be entitled to unemployment

benefits, an employee must not have caused his dismissal by his wrongful action or inaction, or his choosing not to be employed, and that causation depends on whether the final act needed to effect separation was committed by the employee or the employer. *Shields,* however, involved the employee's affirmative act of selecting the separation package offered by the employer, which the appellate court held was a voluntary separation. *Id.* at 545. Here, no such affirmative act is involved, and, in my view, Claimant's failure to accept the terms of the letter was justified.

More importantly, there was an issue in *Shields* about whether, even if the separation was voluntary, it was for good cause attributable to the employer. *Id.* at 543. There, the employee claimed that the reason he chose to take the separation package was because he was told that if he did not, he would be assigned to work on a new production line for which he had no formal training. *Id.* at 542. The court held that under the facts there, the record contained no evidence that employee quit in good faith because he made no effort to resolve the dispute before resorting to the drastic remedy of quitting. *Id.* at 545. In direct conflict with the facts of the instant case, the *Shields* court held that the record did not support employee's contention that he was not required to address his concerns about the lack of training because it was made clear to him by his employer that his only recourse was the separation package. *Id.* In the instant case, Claimant was clearly told that the offer contained in the letter from the president was "nonnegotiable." In my view, the uncertain conditions contained in that letter, along with its nonnegotiable status, constituted good cause attributable to the College for Claimant's decision not to accept its terms. In addition, I believe that his failure to attempt to resolve his concerns about the

lack of clarity concerning what duties would be required, over what time, and for what compensation, were justified by the ultimate conditions of nonnegotiability and short response time. I would reverse the order of the Commission.