Sarah **MILLER**, Claimant–Respondent,

v.

**GREAT SOUTHERN BANK,**
**Employer–Appellant,**

and

**Missouri Division of Employment Security, Respondent.**

No. SD 31192.

Missouri Court of Appeals,
Southern District,
Division One.

March 26, 2012.

Application for Transfer Denied
April 5, 2012.

Application for Transfer
Denied May 29, 2012.

---

Rick E. Temple, Springfield, MO, for Appellant/Employer.

Larry R. Ruhmann, Jefferson City, MO, for Respondent/Claimant.

DON E. BURRELL, Presiding Judge.

Great Southern Bank ("Employer") appeals the decision of the Labor and Industrial Relations Commission ("the Commission") finding Sarah Miller ("Claimant") eligible for unemployment benefits. Specifically, Employer argues that Claimant was disqualified for benefits because "the competent and substantial evidence supports the conclusion that Claimant 'voluntarily left her work without good cause attributable to her work or the employer,' in that Claimant was released by her doctor to return to work but did not follow up or notify [Employer] of such release." Because Claimant's failure to return to work for Employer was "involuntary" due to a serious health condition, we affirm the decision of the Commission.

**Applicable Principles of Review**

■ Our review is governed by article V, section 18 of the Missouri Constitution and § 288.210.[1] *Scrivener Oil Co., Inc. v. Crider*, 304 S.W.3d 261, 266 (Mo.App. S.D. 2010). The Commission's decision must be "supported by competent and substantial evidence upon the whole record." Mo. Const., art. V, sec. 18. "The findings of the [C]ommission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive," and we

> may modify, reverse, remand for rehearing, or set aside the decision of the commission on the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the decision was procured by fraud;
>
> (3) That the facts found by the commission do not support the award; or
>
> (4) That there was no sufficient competent evidence in the record to warrant the making of the award.

---

1. Constitutional references are to the Missouri Constitution (1945). Unless otherwise indicated, all statutory references are to RSMo Cum.Supp.2010.

§ 288.210. The slightly different constitutional and statutory standards may be read together such that "[a] court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, *i.e.,* whether the award is contrary to the overwhelming weight of the evidence." *Reno v. Tyson Poultry, Inc.,* 204 S.W.3d 347, 350 (Mo.App. W.D.2006) (quoting *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. banc 2003)).[2]

■ In determining whether there is sufficient competent and substantial evidence to support an award, we examine the whole record to determine whether the award is contrary to the overwhelming weight of the evidence, keeping in mind that the credibility of witnesses and the resolution of conflicting evidence are matters determined solely by the Commission. *Harris v. Division of Emp't Sec.,* 350 S.W.3d 35, 39 (Mo.App. W.D.2011). "When the evidence of each party and inferences to be drawn therefrom conflicts, resolution of the conflicting inferences is the job of the [C]ommission, and its resolution is binding on the reviewing court." *Scrivener,* 304 S.W.3d at 267.

### Factual and Procedural Background

At the time of her separation from employment on June 14, 2010, Claimant had worked for Employer for almost eleven years. For the twelve-week time period immediately prior to June 7, 2010, Claimant had been on extended leave because "[s]he had an illness that prevented her from working." Claimant suffered from a number of medical conditions, including uterine cancer and kidney disease. Employer did not contest the seriousness of Claimant's medical conditions.

On Monday, June 7, 2010, the day she was scheduled to return to work from her extended leave, Claimant called Employer and said she would not be able to make it in. The next day, Claimant met with her supervisor and Employer's assistant director of human resources ("ADHR") to provide them with documentation of the fact that she had been released by her doctor to return to work. During that meeting, Claimant was informed that her supervisor would not be able to accommodate any further absences. Claimant worked the rest of that day as well as the next two days. On Friday, Claimant's husband called Employer and left a message for Claimant's supervisor that indicated Claimant would be unable to work because she had strep throat and was running a fever.

On the following Monday, June 14th, Claimant again called in sick. ADHR made arrangements for a conference call early that afternoon between herself, Claimant, and Claimant's supervisor. During that conference call, Claimant told Employer's representatives that she did not know when she would be able to return to work and that her doctors were urging her to consider seeking disability benefits. ADHR explained to Claimant that she understood Claimant's situation and that Claimant didn't want to leave her position, but she testified:

> [Claimant] had returned to work and—and, again, she was stating that she didn't know if she was going to be able to return to work. And at some point we had to make a business deci-

---

2. *Hampton* was a workers compensation case where the constitutional standard cited above was compared with § 287.495.1, RSMo 2000. 121 S.W.3d at 222. Our high court stated that "[t]he constitutional standard ('supported by competent and substantial evidence upon the whole record') is in harmony with the statutory standard ('sufficient competent evidence in the record')." *Id.*

sion to say, well, the—the job is open. You're telling us that you can't fill the job. So we're not going to hold it against you but please understand we're going to look at that as a voluntary resignation and we need to fill the position.

ADHR explained that she would record the separation as a voluntary resignation so that Claimant would be eligible for re-hire when Claimant had a doctor's release stating that she could return to work. Claimant believed that Employer had ter-minated her employment during that con-ference call.

In addition to ADHR's testimony, Em-ployer offered (and the Appeals Tribunal received into evidence) multiple exhibits related to the June 14th telephone confer-ence. One of these exhibits was a typed, signed memorandum from another em-ployee dated June 14, 2010 ("the FMLA memorandum"). The FMLA memoran-dum bore a handwritten note on the upper corner with the same initials as those of ADHR; the note stated that the employee was Employer's "FMLA document special-ist" and that the employee was present for the conference call with Claimant although Claimant was unaware of her presence. It also stated that the employee "sat in on a conference call" regarding Claimant on June 14, 2010, summarized Claimant's work attendance leading up to the meet-ing, noted statements Claimant made dur-ing the call about her physical condition, and provided the following details:

> [Claimant] stated that she did not know what she was going to do since she had no Medical Leave left. [ADHR] ex-plained to her that since she did not have any Leave left that we would con-sider that she had voluntary [sic] re-signed and she could apply for other opportunities within [Employer] that would be more accommodating.

[Claimant] stated again that she can't resign and asked us to send her some-thing in writing. [ADHR] told her that we would not be able to provide any-thing in writing.

[Claimant] again stated that she did not want to resign and it looked like she would not be able to work anywhere.

[ADHR] finished the call by summar-izing the meeting we had with [Claim-ant] on June 8th and explained that we could not accommodate any future ab-sences. And since [Claimant] was not resigning her position, we would docu-ment her file as such.

Arrangements were made for her to pick [sic] her personal possessions she had at her desk and returning her phob [sic] when she cam[e] to pick them up. [The memorandum goes on to discuss the handling of Claimant's accrued vaca-tion and retirement and investment plans.]

I called Security to have them deacti-vate her phob [sic].

Another memorandum received into evi-dence was purportedly authored by ADHR and also concerned the June 14th tele-phone conference ("the ADHR memoran-dum"). The ADHR memorandum stated:

> [ADHR] explained that since [Claim-ant] was not able to come to work and her absences were related to her previ-ous condition that it would need to be treated like a leave situation and since she has exhausted her leave that means she would be required to work her full-time schedule. [ADHR] also explained that in similar situations when an em-ployee has not been able to return to work once they've exhausted their leave we consider that a voluntary resignation. By treating it this way, she would have the ability to look at other opportunities within [Employer] that could possibly accommodate a flexible and/or part-time

schedule. At this point [Claimant's supervisor] does not have anything else available except for full time.

The ADHR memorandum also documented ADHR's refusal to "provide something to [Claimant] in writing to document this for the unemployment office" and that "since [Claimant] was not choosing to return to work we would document the file as such." It reflected that ADHR told Claimant "that the phob [sic] would be deactivated but if she could bring it by and give it to [her supervisor] at the time she gathered her personal belongings, it would be appreciated."

Later in the afternoon of June 14th, Claimant went to the doctor, and the doctor cleared her at that time to return to work the next day, June 15th. Claimant did not call Employer to inform her supervisor or ADHR about her latest release to return to work because she believed she had already been terminated. Instead, Claimant applied for unemployment benefits on June 15, 2010.

The same day Claimant filed for benefits, ADHR mailed Claimant a letter which summarized the content of the previous day's telephone conference. The body of the letter stated:

I am sending this letter to document the telephone conversation held with you yesterday regarding your employment with Great Southern Bank. Participants on this call included yourself, your immediate supervisor, Jim Mallonee, and me. The call was prompted as a result of your failure to report to work as scheduled on Friday, June 11, 2010 and yesterday, Monday, June 14, 2010. During the call you disclosed the fact that since returning from qualified medical leave on June 8, 2010 of last week, your health condition has deteriorated to a point that would prevent you from fulfilling the essential duties of your position as Construction Management Assistant. You further stated that you were currently working with your personal physician for treatment of the health condition, and that you were unsure when you might be able to return to work.

During our conversation I reminded you of the meeting you and I had upon your return from qualified medical leave on Tuesday, June 8, 2010. You acknowledged that during this meeting I had explained to you that all of your qualified medical leave had been exhausted at that time. I then explained that given your current health condition, if you were unable to return to work, Great Southern would consider that a voluntary termination of your employment.

Based on the review of our conversation and/or unless I receive documentation indicating that you are able and willing to return to your position as Construction Management Assistant, I will code your personnel file as a voluntary resignation effective Monday, June 14, 2010.

If you have any questions about the information contained in this letter, please feel free to contact me at [telephone number] or the mailing address listed below.

After Claimant received that letter on June 16th, she called to leave a message for ADHR because she "was confused because it said that it looked like [she] voluntary [sic] resigned." In her voicemail message, Claimant reiterated that she did not want to resign and stated that she was going to speak with an attorney about the letter she had received if she was well enough to get out of bed the next day. Claimant did not tell Employer about her latest work release at that time because she thought she had been fired. Employer received no further documentation from Claimant, and ADHR, based upon the last

information she had received, believed Claimant was too ill to return to work.

On June 21st, Employer sent the Commission a letter protesting Claimant's application for benefits on the ground that Claimant had voluntarily resigned due to illness. A Division of Employment Security ("the Division") deputy ("the Deputy") determined that Claimant was discharged on June 10, 2010, but that she was not disqualified from receiving benefits. The deputy found that Claimant's discharge was not for misconduct related to work because her "absences were due to illness and properly reported."

Employer timely appealed the Deputy's decision, and a hearing subsequently held before a referee of the Division's Appeals Tribunal produced the evidence related above. The Appeals Tribunal modified the Deputy's decision, finding that Claimant left work on June 14, 2010, not on June 10, 2010. The Appeals Tribunal did agree with the Deputy that Claimant "did not leave work voluntarily" because her inability to return to work was occasioned by her serious health issues and that Claimant was therefore not disqualified from receiving benefits under the reasoning set forth by our high court in *Difatta–Wheaton v. Dolphin Capital Corp.*, 271 S.W.3d 594 (Mo. banc 2008).

Employer timely filed an application for Commission review, arguing that the Appeals Tribunal failed to consider Claimant's admission that she did not give Employer documentation that later in the day on June 14th her doctor had given her a release to return to work on June 15th and that *Difatta–Wheaton* did not apply because of Claimant's failure to provide Employer with that documentation. The Commission, with one member dissenting, affirmed and adopted the decision of the Appeals Tribunal. This appeal timely followed.

**Analysis**

■ Employer argues the Commission erred "because the competent and substantial evidence supports the conclusion that Claimant 'voluntarily left her work without good cause attributable to her work or the employer,' in that Claimant was released by her doctor to return to work but did not follow up or notify the employer of such release." In its supporting argument, Employer points to Claimant's admissions under cross-examination that she did not give Employer a date when she would be able to return to work and did not give Employer a copy of the doctor's release to return to work she obtained on June 14th. Employer claims this work release and Claimant's failure to provide it to Employer distinguishes the instant case from *Difatta–Wheaton* because "Claimant did <u>not</u> take 'the steps necessary to preserve her employment.'" (Emphasis in original). The Division responds that this case is controlled by *Difatta–Wheaton* and that any events which occurred after Claimant's separation from employment on June 14th are not relevant. We agree.

■ Whether an employee voluntarily quit or was involuntarily terminated is a question of fact to be resolved by the Commission. *Turner v. Proffer Transp., Inc.*, 310 S.W.3d 769, 774 (Mo.App. E.D. 2010). Whether a voluntary quit was "without good cause attributable to such work or to the claimant's employer" under the facts as found by the Commission is a legal question we review *de novo*. § 288.050.1(1); *Partee v. Winco Mfg., Inc.*, 141 S.W.3d 34, 38 (Mo.App. E.D.2004). Here, the Commission adopted the Appeals Tribunal's finding that Employer did not discharge Claimant but it also found that "[C]laimant is not disqualified for benefits by reason of [Claimant's] involuntary

separation from work on June 14, 2010." Thus, we determine whether the Commission's findings that Claimant involuntarily separated from employment and that the separation occurred on June 14, 2010 was supported by sufficient competent and substantial evidence.

■ "Substantial evidence is evidence which has probative force on the issues and from which the trier of facts can reasonably decide the case." *Brown v. Division of Emp't Sec.,* 947 S.W.2d 448, 452 (Mo.App. W.D.1997). Whether there is substantial evidence to support the decision does not necessarily depend upon the quantity of the evidence. *Gregory v. Detroit Tool & Eng'g,* 266 S.W.3d 844, 846 n. 3 (Mo.App. S.D.2008). The testimony of one witness, even if contradicted by the testimony of other witnesses, may be sufficient competent evidence to support an administrative decision. *Id.*

■ "The purpose of Missouri's unemployment compensation act is to provide benefits to persons who are unemployed through no fault of their own." *Lindsey v. University of Missouri,* 254 S.W.3d 168, 171 (Mo.App. W.D.2008). "For this reason, the disqualifying provisions of the act 'are to be strictly construed against the disallowance of benefits to unemployed but available workers.'" *Id.* (quoting *Missouri Div. of Emp't Sec. v. Labor & Indus. Relations Comm'n of Missouri,* 651 S.W.2d 145, 148 (Mo. banc 1983)).

■ § 288.050.1(1) provides that "a claimant shall be disqualified for waiting week credit or benefits ... if the deputy finds ... [t]hat the claimant has left work voluntarily without good cause attributable to such work or to the claimant's employer." Under this section, the term "voluntarily" is defined as "'proceeding from the will: produced in or by an act of choice.'" *Difatta–Wheaton,* 271 S.W.3d at 598 (quot-

ing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2564 (Unabridged, 1993)). Thus, "[a]n employee is deemed to have left work voluntarily when he leaves of his own accord, as opposed to being discharged, dismissed, or subjected to layoff by the employer." *Miller v. Help at Home, Inc.,* 186 S.W.3d 801, 806 (Mo.App. W.D.2006). "[T]hose who leave work involuntarily are never disqualified from eligibility under this provision," and so the statute "requires a court to make a factual determination regarding voluntariness." *Difatta–Wheaton,* 271 S.W.3d at 598; *Harris,* 350 S.W.3d at 39 ("The question of whether an employee left work voluntarily or was discharged is generally a factual determination").

Both parties agree that the analysis in this case is governed by *Difatta–Wheaton.* In *Difatta-Wheaton,* our supreme court held that an employee did not voluntarily quit her employment when she was absent due to serious illness, properly reported those absences to her employer, and "took the steps necessary to preserve her employment given these uncontrollable factors." 271 S.W.3d at 598–99.

When Claimant missed her scheduled first day back at work (a Monday), she called to notify Employer. When she did return to work the next day, she provided documentation that her doctors had released her to return to work. When Claimant missed work again two days later, on Friday, she made arrangements to have her husband notify Employer of the situation. On the following Monday, Claimant notified Employer of her continued illness and participated in a telephone conference regarding her situation. Claimant was told that if she was unable to return to work, the human resources department would "code" her resulting separation as a voluntary resignation. Claimant reiterated that she did not want to

quit. Claimant believed based on the telephone conference that she had been terminated from her employment. The FMLA and ADHR memoranda offered by Employer documented that Claimant made clear during the June 14th conference call that she did not want to resign her work. This constituted sufficient competent and substantial evidence supporting the Commission's determination that Claimant's decision to leave work was not voluntary as defined in *Difatta–Wheaton*, 271 S.W.3d at 598–99.

Employer's primary argument to the contrary relies on Claimant's failure to notify Employer that, after the June 14th telephone conference, her doctor released her to return to work on June 15th. Employer asserts its letter of June 15th informed Claimant that she would have been able to return to work if she had provided Employer with that release from her doctor and that Claimant was therefore at fault for her unemployment.

The factual determination of Claimant's date of separation is critical to our analysis of Employer's claim because it affects the reasonableness of Claimant's efforts to maintain her employment. The opinion in *Harris* is instructive. In that case, the employee was on an extended medical leave scheduled to expire on February 8, 2010. 350 S.W.3d at 37. At that time, the release provided by her doctor stated that she could return to work "in February" but did not list a specific date. *Id.* And although the employee spoke with a secretary at the doctor's office several times in an attempt to have an updated release faxed to her employer, the doctor's office failed to provide the appropriate documents to the employer. *Id.*

Subsequently, the employee's position was filled, and the employee's direct supervisor told her to clean out her locker. *Id.* at 38. When the employee told the human resources department about the difficulties in getting the updated paperwork from her doctor, her contact in the department told her that if she could get the paperwork by a specific date, the employer "would allow her to work with a recruiter to apply for different jobs with [the e]mployer." *Id.* The employee applied for benefits, and the Commission determined that the employee had left her work voluntarily. *Id.* In reversing the Commission's decision, the Western District relied on *Difatta–Wheaton* in determining that the employee had not voluntarily left her employment. *Id.* at .40. Among the arguments made by the employer in *Harris*, was that the employee had a continuing obligation to provide the paperwork from her doctor after she had been told to clean out her locker but before the conversation in which she was told she could work with the employer to find another position with the company if she provided the paperwork by a specific date. *Id.* at 41. The Western District rejected this argument because the offer of an opportunity to search for another job with the company was not the same as the guarantee of a right to return to her former position. *Id.*

Here, Employer's argument that Claimant failed to report her work release is not persuasive because the date of separation from employment is a factual finding for the Commission and substantial evidence—Claimant's testimony that she had been terminated during the June 14th conference call and the FMLA and ADHR memoranda introduced by Employer—supported it. *See Gregory*, 266 S.W.3d at 846 n.3. That determination is further supported by the fact that Claimant sought unemployment benefits the very next day and by Employer sending a letter to Claimant that listed her date of "resignation" as June 14th.

In Addition, both the FMLA and ADHR memoranda documented that although Claimant requested "something [ ] in writing[,]" regarding the action taken at the meeting and despite the fact that a letter was subsequently sent, Claimant was told during the meeting that nothing would be provided in writing. A reasonable inference to be drawn from that statement is that Claimant need not expect further word from Employer regarding her status as of the end of the telephone conference. The FMLA memorandum also documented that arrangements were made during that June 14th conference call for Claimant to pick up her belongings. A reasonable inference from that statement was that Claimant would no longer be permitted access to the building as an employee because "Security" was requested that same day to "deactivate her phob [sic]." Indeed, the ADHR memorandum stated that Claimant was told that her fob would be deactivated, but it would be good if she could return it to Employer when she collected her belongings. The Commission could reasonably infer from this statement that Employer's action was immediate and would not be delayed until Claimant came in to pick up her personal property. When the evidence is conflicting, we are bound by the Commission's resolution of the disputed facts. *Nickless v. Saint Gobain Containers, Inc.,* 350 S.W.3d 871, 873 (Mo. App. E.D. 2011).

Employer disagrees with the assertion that Claimant's actions after the June 14th telephone conference are irrelevant, relying on *Davis v. School of the Ozarks, Inc.,* 188 S.W.3d 94 (Mo.App. S.D.2006), and *Simpson Sheet Metal, Inc. v. Labor & Indus. Relations Comm'n of Missouri,* 901 S.W.2d 312 (Mo.App. S.D.1995). Employer claims those cases stand for the proposition that what happens after an employee is terminated can be relevant in determining benefits eligibility. This argument rests on an oversimplification of

the facts and analyses involved in those cases. In each case, there was a factual dispute about which of two events resulted in the employee's termination. *Davis,* 188 S.W.3d at 100 n.5; *Simpson Sheet Metal,* 901 S.W.2d at 315. The reviewing court found in each case that it was the latter of the two events which had actually resulted in termination. *Davis,* 188 S.W.3d at 100 n.5; *Simpson Sheet Metal,* 901 S.W.2d at 315.

In *Davis,* the employee failed to follow certain guidelines, and the employer told the employee in a letter that it did not intend to renew the employee's yearly contract. 188 S.W.3d at 98. After receiving that letter, the employee (who had been suspended with pay) made efforts to bring his conduct into conformance with the guidelines. *Id.* The employer then offered to renew the yearly contract, but the employee did not respond to that offer. *Id.* at 98–99. When the employee then applied for unemployment compensation upon the expiration of his old contract, the Commission found he had voluntarily quit based on his failure to respond to the employer's offer to renew his yearly contract. *Id.* at 99. The employee argued on appeal that the Commission erred because he had been terminated when his employer initially announced its intention not to renew his yearly contract. *Id.* at 100. We disagreed with that assertion, finding that the letter did not terminate the employee's existing employment because: 1) even after that letter was sent, the employee remained on suspension with pay for several months; and 2) before the original contract expired, the employer offered to renew it. *Id.* In other words, the employee was still employed when he failed to respond to the employer's offer to renew his contract.

In *Simpson Sheet Metal,* two employees were fired for calling the company presi-

dent an obscene name after they were informed that they would be laid off. 901 S.W.2d at 314. The Commission found that the employees were entitled to unemployment benefits because they had not committed misconduct connected with work (*see* § 288.050.2) as they had already been laid off at the time they committed the misconduct. *Id.* In disagreeing with that conclusion, we carefully analyzed the facts to determine the exact moment when the employees had been terminated from their employment. *Id.* at 315. Because the layoff at issue was to be a temporary situation only, we found that "[t]he employees engaged in misconduct connected with their work before their employment was terminated." *Id.*

Under the principle espoused by Employer, it would not have been necessary to determine what event had actually resulted in the employee's final separation in these cases. But we did find it necessary to do so, finding in each case that the employees at issue had not been terminated at the point alleged. *Davis*, 188 S.W.3d at 100–01; *Simpson Sheet Metal*, 901 S.W.2d at 315. In arguing otherwise, Employer simply assumed the first event—the announcement of the intent not to renew the contract in *Davis* and the announcement of the layoff in *Simpson Sheet Metal*—resulted in termination even though that was not the holding in either case. *Davis* and *Simpson Sheet Metal* simply do not stand for the proposition that actions taken by an employee after he or she is terminated from employment are relevant in determining the employee's eligibility for benefits under § 288.050.1(1). Here, the Commission correctly determined that Claimant's failure to inform Employer that she could return to work *after* she had already been separated from her employment was not relevant to whether she was entitled to benefits under the *Difatta–Wheaton* rubric.

The Commission's decision was supported by sufficient competent and substantial evidence. As in *Difatta–Wheaton* and in *Harris*, 1) Claimant's decision to leave work was not voluntary but was caused by an illness that prevented her from returning to work; 2) Claimant properly reported her absences; and 3) Claimant did everything she could to attempt to preserve her employment until the time she was separated from her employment on June 14, 2010. Employer's points are denied, and the decision of the Commission is affirmed.

RAHMEYER and LYNCH, JJ., concur.