Edward TURNER, Appellant,

v.

MITCH MURCH'S MAINTENANCE MGMT. COMPANY and Division of Employment Security, Respondents.

No. ED 98665.

Missouri Court of Appeals, Eastern District, Division Three.

March 26, 2013.

John J. Ammann, St. Louis University Legal Clinic, St. Louis, MO, for Appellant.

Robert A. Bedell, Mitch Murch's Maint. Mgmt. Co., Pro Se, Jefferson City, MO.

ROBERT G. DOWD, JR., Presiding Judge.

Edward Turner ("Claimant") appeals from a decision of the Labor and Industrial Relations Commission ("the Commission") denying him unemployment benefits. Claimant argues the Commission erred in concluding he voluntarily quit his job by not calling in or showing up to work after June 25, 2010. We reverse.

## I. BACKGROUND

Claimant began working for Mitch Murch's Maintenance Management ("Employer") in September of 2006. He started to experience dizziness, blackouts, and lack of energy in May of 2010 and sought medical treatment after his shift on May 11, 2010. Claimant was diagnosed with esophageal cancer and a bleeding ulcer for which he required a blood transfusion. Forced to miss work due to his illness, Claimant called Employer's call center to report his absences beginning on May 12, 2010, the first day of his hospitalization.

Claimant was released from the hospital on May 26, 2010 and sent to an extended care nursing home for further treatment.

On June 15, 2010, Employer completed an Employee Record Notification ("ERN") regarding Claimant's employment status. After the words "Effective Date," Employer wrote "6/15/10." Under the word "separations," the Employer listed Claimant's last date worked as May 11, 2010. Under the words "reason for termination" on the document, the Employer circled "voluntary quit" and "never showed up or called." Above the words "Date Signed," Employer wrote "6/15/2010." The document was then signed by Brian Await ("Await"), an area manager for Employer.

On June 25, 2010, in response to an inquiry regarding his employment status, Claimant received a letter from Employer via fax stating the first and last dates he had worked. As found by the Commission, Claimant "ceased his calls to Employer on June 25, 2010."[1] The Commission found Claimant likely stopped calling Employer out of frustration because Employer "was not responsive to his queries" as to his employment status. Five days later, on June 30, 2010, Claimant filed a claim for unemployment benefits.

In response to Claimant's unemployment claim, Employer filed the ERN in preparation for a hearing before the Appeals Tribunal. As found by the Commission, Claimant "did not receive this docu-

---

1. The only evidence in the record to support the Commission's finding that Claimant called Employer through June 25 is Claimant's testimony during the second hearing before the Appeals Tribunal. The Commission prefaced its findings of fact by stating, "[w]e find claimant's responses on cross-examination unconvincing and, ultimately, we find claimant's testimony as to how he interpreted the June 25 letter to lack credibility." Based on the Commission's finding regarding Claim- ant's last phone call, the Commission must have found Claimant's testimony as to the June 25 letter not credible while finding Claimant's testimony that he called Employer through June 25 to be credible. This credibility determination is perfectly valid as a finder of fact can choose to believe all, none, or some of a witness's testimony. *Reyner v. Crawford*, 334 S.W.3d 168, 172 (Mo.App. E.D. 2011).

ment from Employer before he made the decision to stop calling Employer on June 25, 2010." Instead, Claimant received the ERN from the Division of Employment Security (the "Division") after he had filed for unemployment benefits.

The Division denied Claimant's unemployment claim. Claimant timely appealed the Division's decision, and the Appeals Tribunal affirmed the denial of benefits. Claimant then timely appealed to the Commission. By a 2–1 margin, the Commission affirmed the denial of benefits on the same grounds as the Appeals Tribunal. The dissent disagreed with the Commission's credibility determinations and its legal conclusions. Claimant then appealed to this Court. The Division filed a motion to remand for further findings. Claimant consented to this motion and we remanded the case to the Commission for further findings; the Commission then remanded to the Appeals Tribunal for a second hearing, citing "evidentiary deficiencies" identified by the parties.[2]

After a second hearing by the Appeals Tribunal, at which only Claimant appeared, the Commission entered findings of fact and conclusions of law. The Commission found that Claimant "ceased his calls to [E]mployer on June 25, 2010" and that Claimant did not seek further clarification of his employment status after that date.[3] The Commission also found that while Claimant's phone calls ceased due to the letter he received on June 25, Claimant could not have legitimately believed he had been discharged as a result of the letter. Instead, the Commission found Claimant understood the letter only to provide his first and last days of work with Employer. The Commission further found Claimant stopped communicating with Employer at this time in part out of frustration with what he perceived to be Employer's failure to tell him whether he had been discharged. Finally, the Commission found Claimant filed his claim for unemployment before receiving the ERN showing a termination date of June 15, 2010 and before learning whether a work separation had occurred. Based on its findings, the Commission concluded Claimant had voluntarily quit his job on June 25, 2010 and affirmed the denial of unemployment benefits. This appeal follows.

## II. DISCUSSION

In his sole point on appeal, Claimant argues the Commission erred in ruling Claimant voluntarily quit his job for failing to continue to call Employer after June 25, 2010. We agree.

 Appellate review of an award made by the Commission is governed by Section 288.210.[4] We may set aside the decision of the Commission only where (1) the Commission acted without or in excess of its powers, (2) the decision was procured by fraud, (3) the facts found by the Commission do not support the award, or (4) there was no sufficient competent evidence in the record to warrant the making of the award. *Ayers v. Sylvia Thompson Residence Ctr.*, 211 S.W.3d 195, 197–98 (Mo. App. W.D.2007); Section 288.210(1)–(4).

2. Specifically, the Appeals Tribunal initially found that Claimant received the June 25 letter on June 3.

3. The Commission's finding on this issue is confusing as the last communication is alternately described as "after June 23 or June 24" and "June 25" throughout the findings of fact and conclusions of law. Ultimately, it is irrelevant whether June 25 was the last day Claimant called Employer or the first day Claimant failed to call Employer as his termination date was June 15.

4. All statutory references are to the Revised Statutes of Missouri (RSMo) 2000, updated through the 2012 Cumulative Supplement.

We defer to the Commission on all factual issues as long as those findings were supported by competent and substantial evidence and were found in the absence of fraud. Section 288.210. We consider all issues of fact not found by the Commission "as having been found in accordance with the result reached." Rule 73.01.[5] We owe no deference to the Commission's conclusions of law or application of the law to the facts. *Munson v. Div. of Empl. Sec.*, 323 S.W.3d 112, 114 (Mo.App. W.D.2010).

In this case, there was no sufficient competent evidence in the record to support a denial of benefits. Instead, the facts conclusively show Claimant was involuntarily terminated on June 15, 2010.

■ A claimant is disqualified from receiving employment benefits if it is found that he left work voluntarily without good cause attributable to such work or to the claimant's employer. Section 288.050.1(1). The employee bears the burden of establishing he was discharged and did not voluntarily quit. *Sartori v. Kohner Props. Inc.*, 277 S.W.3d 879, 884 (Mo.App. E.D. 2009).

■ A Section 288.050 analysis involves several interrelated words that describe different types of work separation. The word "termination" may refer to a voluntary or an involuntary work separation. *See Ross v. Whelan Sec. Co.*, 195 S.W.3d 559, 565 (Mo.App. S.D.2006) (identifying the three disqualifying events in Section 288.050 addressing the manner of the employee's work separation as voluntary termination, retirement, and discharge). A voluntary termination, or "voluntary quit," occurs when the employee "leaves work voluntarily without good cause attributable to such work or to the [employee's] employer." Section 288.050.1(1). An involuntary termination, or "discharge," occurs

when the employer ends the work relationship. *See* Section 288.050.2.

■ In a voluntary quit analysis, our Supreme Court has recognized that the word "voluntary" should be given its plain meaning of "proceeding from the will: produced in or by an act of choice." *Difatta– Wheaton v. Dolphin Capital Corp.*, 271 S.W.3d 594, 598 (Mo. banc 2008). A claimant's absence from work due to a non-work-related illness is not, as a matter of law, leaving work voluntarily. *Id.* It is difficult to apply the phrase "left work voluntarily" where "the employee has conscientiously provided notice of the absence, purports to want to be at work, and claims constraint from attendance by circumstances such as sickness or some other difficulty." *Johnson v. Div. of Emp't Sec.*, 318 S.W.3d 797, 801 (Mo.App. W.D.2010). Instead, voluntary quit should be "reserved for those cases in which the employee not only does not show up, but also impliedly rejects the employment and the employer by some action such as failing to provide notification of the absence." *Id.* at 804. Further, the language of Section 288.050.1(1) "must be strictly and narrowly construed in favor of finding that an employee is entitled to compensation." *Robinson v. Courtyard Mgmt. Corp.*, 329 S.W.3d 736, 739 (Mo.App. E.D.2011).

Based on an examination of the record as a whole, we find that there is insufficient competent and substantial evidence to support the Commission's finding that Claimant voluntarily left his employment on June 25, 2010.

Preliminarily we note that even if we believed Claimant did voluntarily quit, the facts the Commission found would not support a termination date of June 25, 2010. Testimony during the first hearing before

5. All rule references are to the Missouri Court Rules (2012).

the Appeals Tribunal established Employer had a three day "no call, no show" policy, after which time Employer would document the employee to be a voluntary quit. The Commission found Claimant called Employer through June 25, 2010. Therefore, the earliest Claimant could have voluntarily quit, according to the Commission's facts and the Employer's policies, was on June 28, 2010, three days after Claimant stopped calling Employer.

■ Claimant did not voluntarily quit, however, and the Commission incorrectly concluded that the ERN, documenting Claimant's termination date of June 15, 2010, was not relevant in determining Claimant's date of termination. The Commission concluded that the ERN was not controlling because (1) the ERN did not suggest Employer discharged Claimant, but instead merely deemed Claimant to have voluntarily quit, and (2) Claimant did not receive the document until after June 25, 2010. We believe both conclusions were in error.

First, we disagree with the Commission's conclusion that the ERN's classification of Claimant's termination as a voluntary quit makes it irrelevant in determining Claimant's termination date. On the contrary, our caselaw is replete with instances where the courts have disagreed with an employer's legal conclusions regarding an employee's termination. For example, in *Difatta–Wheaton v. Dolphin Capital Corp.*, 271 S.W.3d 594 (Mo. banc 2008), the employer completed documentation on June 5 stating the employee had voluntarily quit due to unexcused absences between May 29 and June 5. The Supreme Court of Missouri disagreed with the Commission's decision, concluding the employee had provided sufficient notice of her absences to her employer. The Court was not bound by the legal conclusions of the employer and found the employee did not leave work voluntarily, despite documentation stating the employee voluntarily quit.

Second, the Commission erred in concluding that because Claimant did not receive the ERN until after June 25, it was irrelevant in determining the date of termination. The Commission found Claimant "filed a claim for unemployment benefits before learning from employer whether it was employer's position that a work separation had, in fact, occurred." Employer's reason for failing to inform Claimant of his termination is revealed through area manager Awalt's testimony before the Appeals Tribunal. Await testified he last spoke with Claimant on June 3, 2010 and he completed the ERN on June 15, 2010 "[b]ecause ... I hadn't heard from him in over a week and a half, [and] if he doesn't have the respect to call me to let me know what's going on then, you know, why do I need to respect him and keep him on." Await further testified Claimant placed his calls to Personnel, the department responsible for "answer[ing] the phone for call offs." Await was in a separate department. The Commission found Claimant contacted Employer through June 25, thus Claimant's calls after June 3 were made to Personnel, the department responsible for handling such calls. In effect, Claimant was terminated for calling off work to the department responsible for call-offs rather than contacting Await directly. We cannot say Claimant's termination was voluntary when it arose out of Employer's lack of inter-office communication.

■ After reviewing the relevant statutes, we conclude actual knowledge of termination from employment is not required to receive unemployment benefits in Missouri. *See* Section 288.040.1. The

statute applies to "[a] claimant who *is* unemployed," not a claimant who has received confirmation from his employer that he is unemployed. *Id.* (emphasis added). Though Claimant did not receive confirmation of his termination until after he filed his unemployment claim, he was unemployed at the time of the filing and therefore eligible for benefits under the statute.[6]

We distinguish *Ewing v. SSM Health Care.* 265 S.W.3d 882 (Mo.App. E.D.2008), a case the Commission relied upon in reaching its decision. There, the employee reported four absences from June 21 through June 26 due to the death of her brother. *Id.* The employee reported these absences via voicemail messages and the employer did not return her calls. *Id.* The employer considered the employee to have voluntarily resigned for unreported absences on June 25 and June 26, in accordance with the employer's two no-call, no-show policy. *Id.* The employee also missed work on June 30, July 1, and July 5 without calling in. *Id.* She acknowledged that the June 30 and July 1 absences were unreported and failed to return to work on July 5 after assuming she had been terminated due to her earlier absences. *Id.*

The court found that the employee's decision not to report to work on June 30 and July 1 met the employer's two "no-call, no show" policy, thus she voluntarily resigned her position. *Id.* at 886. The court offered two options by which the employee could have retained her job: (1) seek clarification of her work status, or (2) continue to call in her absences. *Id.* at 887. Because the employee did neither, her resignation was deemed voluntary. *Id.*

■ The Commission relied on *Ewing* for the proposition that a claimant who assumes he is discharged without taking steps to clarify his employment status is deemed to have left work voluntarily. However, unlike in *Ewing,* Claimant did seek clarification of his employment status. In fact, Claimant "continually ask[ed] Employer to provide him with documentation to let him know whether he still had a job," finally receiving the June 25 letter containing his first and last days of employment. In addition, Claimant continued to call in his absences through June 25. While the Commission found Claimant did not legitimately believe the June 25 letter ended his employment and that Claimant did stop calling Employer after June 25, we find the clarification requirement from *Ewing* does not necessitate perpetual requests for clarification when faced with an uncooperative employer.

■ In summation, we reject the notion that the relevance of employer records are in any way connected to the employer's own legal conclusions regarding termination or the employer's willingness to share such documentation with the affected employee. The ERN states Employer terminated Claimant on June 15, 2010. Claimant attempted to verify his employment status while undergoing cancer treatment, but stopped calling Employer on June 25 because he became frustrated due to Employer's failure to adequately respond to Claimant's inquiries. While Claimant stopped calling Employer before learning of his termination, he could not quit a job he no longer had. Any events that occur after an employee's termination are not relevant in determining whether the termination was voluntary. *Miller v. Great Southern Bank,* 367 S.W.3d 111, 117

---

**6.** We are not concerned that a still-employed person may attempt to file for unemployment. Such a claimant would quickly lose their claim as the claimant would not be unemployed at the time of filing.

(Mo.App. S.D.2012). Based on the ERN and the Commission's facts, we conclude Employer terminated Claimant on June 15, 2010.

Having resolved Claimant's date of termination, we must now determine if Claimant voluntarily quit, as the ERN suggests, or if Claimant's termination was involuntary. We find the Missouri Supreme Court case of *Difatta–Wheaton v. Dolphin Capital Corp.* is controlling. There, the claimant missed work due to ovarian cancer. *Id.* at 595. The claimant provided doctor's notes to her supervisor, informing the employer why she was missing work and where she would be. *Id.* The employer terminated the claimant and considered her to have voluntarily quit due to a week of unexcused absences, beginning on the day the employer received the doctor's notes. *Id.* The Court stated:

> It cannot be said that [the claimant] made a choice or was otherwise responsible for her ovarian cancer, its complications, or the timing of their occurrence. And, she took the steps necessary to preserve her employment given these uncontrollable factors. It would be inconsistent with the statutory language of "no fault" and "voluntarily" to hold otherwise.

*Id.* at 599.

Similarly here, Claimant was diagnosed with esophageal cancer and a bleeding ulcer on May 12, 2010 and was hospitalized. Claimant did not choose and was not responsible for his esophageal cancer. Throughout his hospitalization, Claimant called Employer to explain where he was and why he could not work. Even after his transfer to an extended care facility, Claimant continued to inform Employer of his whereabouts until (and even after) his termination on June 15, 2010. By regularly communicating with Employer, Claimant took the steps necessary to preserve his employment, despite his cancer diagnosis.

Conversely, we find the cases of *Turner v. Labor & Indus. Relations Comm'n of Mo.*, 793 S.W.2d 191 (Mo.App. W.D.1990) and *Reutzel v. Missouri Div. of Empl. Sec.*, 955 S.W.2d 239 (Mo.App. S.D.1997) to be distinguishable. In *Turner*, the claimant's doctor called her employer to explain her hospitalization. *Turner*, 793 S.W.2d at 192. The next day, claimant checked out of the hospital against medical advice, informing her doctors she would be taking some time off of work. *Id.* The claimant missed work on Monday, Tuesday, Wednesday, and Thursday before finally calling her employer on Thursday night to inform her manager she would be back to work the next Monday. *Id.* Also on Thursday, the employer learned the claimant was no longer in the hospital but instead had taken her children to the lake the day before. *Id.* The employer's policy required an employee too ill to work to notify the company of the illness within three days; failure to do so would be considered a self-termination. *Id.* Because claimant did not call her employer for more than three days after checking herself out of the hospital, the court concluded her termination was voluntary. *Id.* at 195.

In *Reutzel*, the claimant missed six months of work while on sick leave and was informed in July she needed to return to work on August 19 to retain her job. *Reutzel*, 955 S.W.2d at 240. The claimant wanted to see her doctor one last time before returning to work and moved her scheduled appointment from October 8 to August 22. *Id.* The claimant did not tell her employer about this doctor's appointment, however. *Id.* Instead, the claimant waited a full week after her scheduled return before calling her employer and stating she was ready to return to work. *Id.* The court concluded the claimant's fail-

ure to return to work on the day she was told to return, combined with her failure to inform her employer she needed "a few extra days," resulted in a voluntary quit. *Id.* at 241–42.

The Supreme Court addressed *Turner* and *Reutzel* in its *Difatta–Wheaton* opinion, grouping those cases and describing them as "the situation where personal illness is coupled with another element, such as lack of notice to the employer." Unlike *Turner*, where the claimant was at the lake when the employer thought she was in the hospital, Employer knew Claimant was in an extended care facility and faxed Claimant's paperwork to that location. Unlike *Reutzel*, where the claimant made her own plans to return without informing her employer, Claimant repeatedly contacted Employer to explain the status of his illness and even attempted to confirm his employment status, despite Employer's failure to give Claimant that information. The Commission made an express finding of fact that Claimant "ceased his calls to Employer on June 25, 2010," thus Claimant continued to notify Employer of his whereabouts until and beyond his June 15, 2010 termination. Therefore, the facts found by the Commission show Employer terminated Claimant while Claimant was still in regular communication with Employer. Therefore, this case is not a "personal illness plus lack of notice" case like *Turner* and *Reutzel*, but instead a "personal illness with notice" case like *Difatta–Wheaton*.

We reserve the label of voluntary quit "for those cases in which the employee not only does not show up, but also impliedly rejects the employment and the employer by some action such as failing to provide notification of the absence." *Johnson*, 318 S.W.3d at 804. Claimant's regular communication with Employer for more than six weeks while undergoing can-

cer treatment suggests Claimant hoped there would be a job waiting for him upon his return. While Claimant did stop calling Employer ten days after his termination, Section 288.050 does not require a claimant to continue to call his former employer after the employment relationship has been terminated to obtain unemployment benefits.

The facts in this case, as a matter of law, can only support the conclusion that Claimant did not voluntarily quit his job. Because Claimant did not voluntarily quit, we need not consider the "good cause" aspect of Section 288.050.1. Therefore, we find that the Commission erred in concluding Claimant voluntarily quit his job because its ruling was not supported by sufficient competent evidence in the record. Point granted.

### III. CONCLUSION

The Commission erred in concluding Claimant voluntarily quit his job, thus disqualifying him from receiving benefits under Section 288.050.1(1). Further, Claimant is not otherwise disqualified from receiving benefits. Claimant is therefore entitled to receive unemployment benefits under Section 288. Because we find Claimant did not voluntarily quit his job, we need not address Claimant's sub-point regarding his eligibility for FMLA leave.

The judgment of the Commission is reversed and the cause is remanded for the entry of an award in accordance with this opinion.

ANGELA T. QUIGLESS, J., concurs.

ROY L. RICHTER, J., dissents in separate dissenting opinion.

ROY L. RICHTER, Judge.

I respectfully dissent. Although I am sympathetic to Claimant and his hard-

ships, I disagree with the majority that the record does not support a termination date of June 25, 2010. To the contrary, our standard of review constrains this Court to follow the Commission's finding that Claimant was in fact terminated on June 25, 2010, when he stopped communicating with his employer. This court is to defer to the Commission's findings of fact. *Div. of Emp't Sec. v. Taney Cnty. Dist. R–III*, 922 S.W.2d 391, 393 (Mo. banc 1996). Moreover, the weight to be given to the evidence and the resolution of conflicting evidence are for the Commission, and its choice is binding upon this Court. *Brinker v. N & R of Jonesburg, Inc.*, 350 S.W.3d 874, 876 (Mo.App. E.D.2011). The "Employee Record Notification" dated June 15, 2010, was conflicting, just as the date Claimant quit calling in absent was conflicting, but nevertheless, inconsequential because Claimant did not receive such notification until after he assumed he had been discharged and ceased communication with Employer. The date on the record does not change Claimant's voluntariness of his decision. The Commission's findings are supported by competent and substantial evidence and should be affirmed.

In determining whether an employee's absence from work, stemming from his diagnosis and treatment of throat cancer, and, after regular notice to his employer abruptly terminated such communication, establishes that he "voluntarily quit," we apply Section 288.050.1(1). This statute states the conditions for when an otherwise eligible claimant for unemployment benefits may be disqualified. A claimant is disqualified from receiving unemployment benefits if it is found that he left work voluntarily without good cause attributable to such work or to the claimant's employer. Section 288.050.1(1). "Logically, then, those who leave work involuntarily are never disqualified from eligibility

under this provision, and of those who do leave voluntarily, some will still be covered under the proviso." *Difatta–Wheaton v. Dolphin Capital Corp.*, 271 S.W.3d 594, 598 (Mo. banc 2008). Although the *Difatta–Wheaton* Court held that leaving work for a non-work-related illness is not, as a matter of law, leaving work voluntarily, the Court found that a factual determination must be made by the court regarding the claimant's voluntariness. *Id.* The employee bears the burden of proving he was discharged and did not voluntarily quit. *Sartori v. Kohner Props., Inc.*, 277 S.W.3d 879, 884 (Mo.App. E.D.2009). Claimant here failed to meet this burden.

Instructive here is the case of *Reutzel v. Missouri Division of Employment Security*, 955 S.W.2d 239, 240–41 (Mo.App. S.D. 1997), in which a claimant was absent from work because of a personal illness, but failed to contact the employer to give notice of that absence. *See also Turner v. Labor and Indus. Relations Comm'n of Mo.*, 793 S.W.2d 191 (Mo.App. W.D.1990) (voluntary quit was found when, after checking out of hospital, claimant did not then return to work and gave no notice of this although there was a policy requiring notice). Here, in light of the Commission's findings of fact, which this Court accepts as true, Claimant voluntarily quit his job with Mitch Murch's Maintenance. This finding is supported by sufficient evidence demonstrating that Claimant stopped informing his employer of his status while receiving cancer treatments. This Court is to defer to the Commission's credibility determination that Claimant was not credible in testifying he believed the June 25, 2010 letter conveyed a message he had been discharged. Specifically, the Commission found, "claimant did not legitimately believe he had been discharged as a result of reading that letter, but rather (as he admitted) understood the letter to

provide his first and last days worked for employer, and no other information." Claimant ceased communication and instead promptly filed for unemployment benefits. Under Employer's policy, three days of missing work without calling was considered a voluntary quit.

Did Claimant leave work voluntarily for good cause attributable to the work or employer? Section 288.050.1. "There are two elements of good cause, reasonableness and good faith." *Bunch v. Div. of Emp't Sec.*, 965 S.W.2d 874, 878 (Mo.App. W.D.1998). Courts have applied the objective standard of what a reasonable person would do in the same or similar circumstances. *Rodriguez v. Osco Drug*, 166 S.W.3d 138, 141 (Mo.App. W.D.2005). "Good cause" is:

> cause that would motivate the average able-bodied and qualified worker in a similar situation to terminate his or her employment.... [Good cause] is positive conduct which is consistent with a genuine desire to work and be self-supporting.... [T]he circumstances motivating an employee to voluntarily terminate employment must be real, not imaginary, substantial, not trifling, and reasonable, not whimsical, and good faith is an essential element.

*Id.* (quoting *Hessler v. Labor and Indus. Relations Comm'n*, 851 S.W.2d 516, 518 (Mo. banc 1993)). To demonstrate good faith, a claimant must show that he made an effort to resolve the dispute before he resorted to the drastic remedy of termination of employment. *Lashea v. Fin–Clair Corp.*, 30 S.W.3d 237, 241 (Mo.App. E.D.2000). The claimant bears the burden of proving both elements of good cause. *Ewing v. SSM Health Care*, 265 S.W.3d 882, 888 (Mo.App. E.D.2008).

Here, Claimant did not follow up with Employer to request a clarification, nor did he ever call his supervisor to discuss his work situation. The Commission found that a reasonable person in Claimant's situation would have contacted his employer for further clarification, rather than just assume and treat the June 25 letter as if the employment relationship had ended. Further, Claimant lacked good faith in failing to communicate with his employer, or, more specifically, his supervisor, about preserving his employment after receiving the ambiguous June 25 letter. The evidence shows that Claimant had the phone numbers and ability to do so. Conversely, Claimant's supervisor's attempts to contact Claimant were unsuccessful because Claimant had not provided his specific contact information. Finding the evidence sufficiently demonstrates that Claimant did not have good cause for voluntarily quitting his employment with Mitch Murch's Maintenance, there is no need to examine whether the cause for his quit was attributable to the work or employer.

Claimant's voluntary quit without good cause should disqualify him from receiving unemployment compensation benefits. I would affirm the Commission's decision.